46                                      425 Mass. 46 (1997)

The Medical Malpractice Joint Underwriting Association of Massachusetts *v.* Goldberg.

## The Medical Malpractice Joint Underwriting Association of Massachusetts *vs.* Harold L. Goldberg & others.[1]

Suffolk. January 9, 1997. - May 19, 1997.

Present: O'Connor, Greaney, Fried, & Marshall, JJ.

*Insurance,* Medical malpractice insurance, Insurer's obligation to defend, Settlement of claim.

This court held that an insurer that defends its insured in a tort action while reserving its rights to later disclaim coverage may later seek reimbursement for an amount paid to settle the underlying action only if the insured has agreed that the insurer, may commit the insured's own funds to a reasonable settlement with the right later to seek reimbursement from the insured, or if the insurer secures specific authority to reach a particular settlement which the insured agrees to pay; the insurer may also notify the insured of a reasonable settlement offer and give the insured an opportunity to accept the offer or assume its own defense. [58-59]

The Medical Malpractice Joint Underwriting Association (JUA) was not entitled to reimbursement from an insured for the amount JUA had paid to a former patient of the insured to settle a judgment obtained against the insured, where JUA had not notified the insured of a settlement offer received from the patient and had not given the insured the opportunity to accept that settlement or to assume his own defense. [55-58, 59-62]

CIVIL ACTION commenced in the Superior Court Department on July 24, 1990.

The case was heard by *David M. Roseman,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Steven L. Schreckinger (Zick Rubin* with him) for the plaintiff.

[1] Harold L. Goldberg, M.D., Inc.; American Universal Insurance Company (American Universal); and the Massachusetts Insurers Insolvency Fund. American Universal was declared insolvent in January, 1991. The Massachusetts Insurers Insolvency Fund, a statutorily mandated association that pays covered claims of insolvent insurers up to $300,000, was joined as a defendant in March, 1992. See G. L. c. 175D, §§ 3, 5.

*Edward J. Barshak* (*Keith S. Brown* with him) for Harold L. Goldberg.

*Alan J. Cooke* for the Massachusetts Insurers Insolvency Fund.

MARSHALL, J. The Medical Malpractice Joint Underwriting Association of Massachusetts (JUA) seeks reimbursement from a policyholder, psychiatrist Harold L. Goldberg, for the amount that JUA paid to Jessie Witherspoon, a former patient of Goldberg, to settle a judgment she obtained against him.[2] The trial judge concluded that JUA had breached its duty to defend Goldberg in the Witherspoon action. He further concluded that JUA was precluded from reimbursement because Goldberg had not authorized the settlement with Witherspoon and because, he found, JUA had reached a settlement with Witherspoon to protect its own interests. Judgment for the defendants was entered, and JUA's complaint was dismissed. JUA timely filed its notice of appeal, and we allowed its application for direct appellate review. We affirm the judgment.

I

We summarize in some detail the facts surrounding Witherspoon's charges against Goldberg and, more particularly, JUA's ultimate settlement of her lawsuit. From May 1, 1976, until November 1, 1989, Goldberg was insured by a series of

---

[2]In JUA's original complaint for declaratory judgment concerning coverage, Goldberg, his professional corporation, Harold L. Goldberg, M.D., Inc. (collectively Goldberg); Witherspoon; and American Universal, the issuer of an excess insurance policy to Goldberg, were named as defendants. When Witherspoon settled the underlying lawsuit with JUA she was dismissed as a defendant in this action. JUA then amended its complaint and sought a declaration that its policies at issue did not provide coverage for the injuries claimed by Witherspoon and for the subsequent settlement between JUA and Witherspoon, and sought reimbursement from Goldberg in the amount of the settlement and the costs of its defense of Witherspoon's suit, both at trial and on appeal. It also sought a contribution from American Universal to the extent that the settlement exceeded JUA's claimed policy limits, and that the costs of the appeal be equitably apportioned between JUA and American Universal.

In May, 1993, JUA changed its name to the Massachusetts Medical Professional Insurance Association. See *Poznik* v. *Massachusetts Medical Professional Ins. Ass'n,* 417 Mass. 48, 49 n.3 (1994).

professional liability insurance policies issued by JUA.[3] Each policy provided coverage in the amount of $1 million per claim and $3 million in the aggregate.[4] Between August 9, 1982, and February 12, 1985, Goldberg was also insured under a series of excess policies issued by American Universal; each policy provided insurance up to $3 million per claim in excess of the underlying JUA policy limits.

In January, 1988, Witherspoon, a former psychiatric patient of Goldberg, sued for unspecified damages for injuries allegedly caused by Goldberg's sexual misconduct toward her.[5] On February 3, 1988, Goldberg informed JUA of Witherspoon's lawsuit. An internal report from a JUA claim supervisor that same day noted that "this psych[iatrist] allegedly had sex with patient" and that, "[i]f allegation is true, we will not indemnify." JUA, thereupon, informed Goldberg that it would provide him "with a defense to the claims asserted by Jessie Witherspoon," but, it noted, the defense would be

[3]From May 1, 1976, until February 12, 1982, Goldberg was insured under a series of one-year "claims made" insurance policies. From February 12, 1982, until November 1, 1989, Goldberg was insured under a series of one-year "occurrence" policies. Goldberg also purchased a "reporting endorsement," effective February, 1984, which covered claims arising between May 1, 1976, and February 12, 1982, the starting and terminating dates of his "claims made" coverage.

[4]The parties stipulated that "each of the [insurance] policies issued to Goldberg provided liability coverage in the amount of $1,000,000 per claim and in the amount of $3,000,000 in the aggregate." The record reflects, however, that one policy issued to Goldberg for the policy period February 12, 1988, to February 12, 1989, provided coverage in the amount of $2 million per claim and $6 million in the aggregate.

[5]At trial Witherspoon established that beginning in April, 1971, she sought psychiatric treatment from Goldberg. In December, 1976, while Witherspoon was still a patient of his, Goldberg commenced a sexual relationship with her which lasted for approximately ten years. Goldberg continued to treat Witherspoon as a psychiatric patient during the course of their sexual relationship. Goldberg explained his sexual involvement with Witherspoon as the byproduct of "transference" which occurs when a psychiatric patient transfers her feelings from life experiences onto the psychiatrist, and "countertransference," the feelings the therapist develops toward the patient based on unconscious feelings toward other people. Goldberg failed to refer Witherspoon to another psychiatrist when sexual activity was sought by her with him, and later he improperly terminated his relations with her. As a result of these and other actions, Witherspoon attempted suicide, was involuntarily committed to a hospital for a period of time and, according to expert testimony, was prevented from pursuing a career as she had intended.

provided to him "subject to the express reservation of the JUA's right to disclaim coverage of the claims" asserted against him.[6]

JUA retained the law firm of Bloom & Buell to defend Goldberg[7]; William J. Davenport assumed the primary responsibility for Goldberg's defense in the Witherspoon matter. The record is clear that from the outset Goldberg sought to settle Witherspoon's claims and that he communicated that desire to JUA.[8] The record is equally clear that Davenport advised JUA that settlement with Witherspoon was called for. In his first report he advised JUA to settle the action, noting that "trial will be destructive to defendant." He noted that Goldberg "admits most of plaintiff's allegations"; he valued settlement at approximately $100,000-$300,000 and the chance of Goldberg's winning at trial at 10%. Neither Davenport nor JUA initiated settlement discussions with Witherspoon.

Several months later, in December, 1988, after Witherspoon had answered Goldberg's interrogatories, Davenport became even less optimistic. Davenport attempted — without success, to put it mildly — to identify an expert to testify that Goldberg had acted in accordance with the standard of the average qualified psychiatrist. Davenport noted in his report to JUA that, even if he could find such an expert, the jury would not believe the testimony: it would "probably only be

---

[6]JUA described its reservations as follows:

1. It denied coverage of any injury arising from conduct occurring during the period from the spring of 1971 to May 1, 1976 (the period before Goldberg's first policy with JUA), and for any other period when Witherspoon was not a patient of Goldberg;

2. it reserved its rights to disclaim coverage with respect to acts which Goldberg did not intend to constitute professional medical services or were objectively outside the scope of professional services; and

3. it reserved its rights to disclaim coverage for all acts that involved an intent to injure or cause emotional harm to Witherspoon.

[7]JUA notes that the firm was retained at the request of Goldberg. That fact is irrelevant.

[8]In May, 1988, Davenport informed JUA that Goldberg was willing to "pay money from his own pocket to settle this claim and has requested that I obtain a Demand from the Plaintiff's attorney." Two months later, a JUA report noted that "[l]iability is probable since Dr. Goldberg admits to the allegations" and that Goldberg "wants this case settled and is willing to pay for it himself."

throwing gasoline on this blazing forest fire." There were still no settlement discussions with Witherspoon.[9]

In mid-1989, Witherspoon retained new counsel with expertise (and national experience) in the area of sexual misconduct claims. Witherspoon's new counsel sent Goldberg a letter as required by G. L. c. 93A, demanding $3 million in damages and other claims. On JUA's recommendation, the demand was summarily rejected. Witherspoon's new counsel promptly filed an amended complaint, seeking damages of $3 million, and adding claims under G. L. c. 93A. Shortly thereafter, on December 13, 1989, Witherspoon made her first settlement demand.[10] In light of Goldberg's deposition testimony, Witherspoon's new counsel noted, "[l]iability appears to be absolute." Witherspoon demanded $1 million or the limit of Goldberg's malpractice insurance policy.[11]

On receiving Witherspoon's demand, Goldberg's counsel again conferred with JUA; he was instructed to make no offer of settlement.[12] Consequently, no response was sent to Witherspoon. In the meantime, Goldberg had become concerned about the refusal of JUA to authorize any offer of settlement

---

[9]JUA notes that late in 1988 Davenport did make one attempt to elicit a demand from Witherspoon's counsel, without success. We note that there is no reason why JUA or Davenport could not themselves have initiated settlement discussions. JUA argues that it was "critical" to await the deposition of both Witherspoon and her subsequent treating psychiatrist before it could respond appropriately to any demand that might be forthcoming from Witherspoon. This appears to be post hoc reasoning, in light of the conclusions already reached by Davenport — experienced trial counsel in matters such as these — as to the appropriateness of an early settlement and an appropriate amount of settlement.

[10]In November, 1989, the Massachusetts Board of Registration in Medicine had revoked Goldberg's license to practice medicine.

[11]It is JUA's position that this was the "lowest demand" ever made by Witherspoon, and that the record "makes clear" that Witherspoon "would at no time have settled for less than $1,000,000." JUA ignores the almost two years that preceded this demand (Witherspoon's first), during the course of which Goldberg and counsel retained by JUA repeatedly recommended settlement, which JUA declined to authorize, and during the course of which discovery confirmed almost absolutely Goldberg's liability to Witherspoon.

[12]JUA's instruction came in the face of counsel's recommendation at that time that a settlement offer be made in the range of $200,000 to $500,000. His recommendation was made in light of his own estimation now that the probability of Goldberg's success at trial was between zero and 5% with a probable verdict range from $300,000 to $1.5 million.

to Witherspoon. In February, 1990, in response to an inquiry from Goldberg's personal attorney, Edward J. Barshak, JUA informed Barshak that it was "considering making" an offer of $50,000, but only if Goldberg would contribute 50%. In reply Barshak wrote to JUA: "[W]ith all the firmness that I can bring to the matter, I submit to you that you have an obligation to Dr. Goldberg to try to settle this case within the policy limits. Further, there is no good faith basis for a failure of your company to carry out that obligation."

Barshak's letter also initiated an exchange of correspondence that took place between February and December, 1990, in which JUA and Goldberg each resolutely maintained their respective views with respect to whether the JUA policies covered the Witherspoon claims against Goldberg.[13] JUA did acknowledge that it was in Goldberg's interest to settle the matter.[14] Three weeks later, in March, 1990, at a pretrial conference in the Superior Court, JUA responded to Witherspoon's settlement demand: Davenport informed the judge that he was not prepared to make *any* offer of settlement to Witherspoon. That same day — the record is not clear as to

[13]In his first letter to JUA Barshak made clear his position that Witherspoon's claims were covered; the claims were "solely" for malpractice and there "are no cases which would enable JUA to successfully contend that the Witherspoon claim is not one for which it will have to pay a judgment procured against Dr. Goldberg." Barshak noted that, "[w]hen the suit was first brought, it contained counts and allegations which conceivably could be outside of the scope of the insurance policies issued by JUA." But, he said, "[t]he situation has changed radically since the time of your original reservation of rights letter. The plaintiff has amended her Complaint. It is eminently clear that the Complaint is solely one for malpractice and for Chapter 93A rights, if any, arising from the alleged malpractice. It is even more clear from recently filed demands by the plaintiff for admissions of fact and the questioning at the renewed deposition of Dr. Goldberg . . . that the plaintiff's Complaint is basically one of alleged misuse or abuse by Dr. Goldberg of the [transference] process which takes place during psychotherapy and alleged improper termination of therapy and alleged improper failure to refer her at various times to a different therapist." JUA replied, reiterating that it was defending Goldberg under a "reservation of rights" and that it was JUA's view that recent events had established "that no coverage exists."

[14]JUA noted that "in light of our view that there is no coverage, any settlement contribution that we might make would be subject to an express reservation on the part of JUA to seek recovery of the settlement amount from Dr. Goldberg in the context of the to-be-filed declaratory judgment action." JUA also noted, for the first time, that it reserved its rights to seek recovery of the "underlying defense costs as well."

which came first — Barshak on behalf of Goldberg again wrote to JUA: "You . . . have the obligation to settle the case within policy limits. . . . Dr. Goldberg hereby agrees and hereby expresses to you through me that if you settle the case, the settlement will not be considered a waiver of your reservation of rights (for whatever value the reservation may have). Therefore, please proceed and settle the case."[15] JUA finally authorized an offer to Witherspoon of $150,000 to settle the case. Witherspoon responded by demanding $2 million. There was no response to this demand from JUA.

In April, 1990, as the commencement date of the trial approached, JUA prepared an internal "large claim" report, which noted that, "if it appears that the plaintiffs [*sic*] are interested in settlement we would attempt to dispose of the case for a settlement in the area of $350,000." No offer was communicated to Witherspoon. The trial began on April 26, 1990. Four days later, while the trial was under way, Barshak again wrote to JUA demanding that JUA settle with Witherspoon.[16] No settlement was proffered. On May 2, 1990, a jury found that Goldberg's negligence was the proximate cause of damages to Witherspoon and awarded her $1,779,785 in damages. On June 14, 1990, the trial judge issued his findings of fact, rulings of law, and order of judgment on Witherspoon's

---

[15]At the same time, Barshak reiterated Goldberg's view on coverage. "In order to avoid any ambiguity," he said, "I am hereby stating again . . . [that the] facts concerning the litigation by Witherspoon against Dr. Goldberg obligate J.U.A. to both defend and pay any adverse judgment up to the limits of the insurance." He continued, "Unlike policies now written by some insurers, there is no applicable exclusion in the policies which you issued to Dr. Goldberg." He also informed JUA that Goldberg would continue to cooperate with counsel retained by JUA to defend him in the Witherspoon case.

[16]Barshak also wrote to the senior claims examiner at American Universal, making clear that Goldberg insisted there *was* coverage under the JUA policies. Characterizing Witherspoon's claims against Goldberg as "psychiatric malpractice by repeated sexual encounters during therapy," Barshak noted that "[t]here is no language of exclusion in the underlying primary policy which would entitle J.U.A. to decline to provide coverage. The insuring agreement in the underlying policy is sufficiently broad to provide coverage. The contention of J.U.A. that they are entitled to defend under a reservation with respect to coverage is not only unjustified, but totally lacks any meaningful analysis. Decided cases throughout the country are unanimously in conflict with J.U.A.'s position." American Universal responded to Barshak the next day, reserving its rights and noting that JUA had not exhausted its policy limits.

G. L. c. 93A claim and ruled that G. L. c. 93A did not apply to the psychiatrist-patient relationship. He dismissed Witherspoon's statutory claim.[17]

On July 24, 1990, JUA filed a complaint for declaratory judgment against Witherspoon, Goldberg, and American Universal.[18] In September, 1990, Goldberg counterclaimed and asserted claims for bad faith negligence in JUA's handling of the underlying lawsuit (with particular reference to its failure to settle the lawsuit), breach of contract coverage, G. L. c. 93A and G. L. c. 176D claims, and sought a declaration that the JUA policies covered the judgment and the potential judgment for G. L. c. 93A treble damages in the Witherspoon lawsuit.

In the interim both Goldberg and Witherspoon filed appeals in the Witherspoon lawsuit. Goldberg sought to reverse the judgment against him, and Witherspoon contested the judge's determination that G. L. c. 93A did not apply to the relationship between psychiatrist and patient. JUA retained new counsel to represent Goldberg on appeal. Appellate counsel advised JUA that Witherspoon's appeal posed unusual risks to JUA,[19] and recommended settlement. JUA then offered $1 million to settle all of Witherspoon's claims.

---

[17]To avoid a retrial should an appellate court hold that G. L. c. 93A did apply to the case, the trial judge adopted the jury's answers to advisory questions, and concluded that Goldberg's conduct was unfair and deceptive, and that his actions were willing and knowing. The judge adopted the jury's valuation of Witherspoon's damages, and noted that, if G. L. c. 93A were to apply, Witherspoon would be entitled to treble damages, as well as attorney's fees and costs.

[18]The complaint sought a declaration "concerning whether the JUA policies insure the judgment in Ms. Witherspoon's suit." A second count against American Universal sought a declaration "concerning whether American Universal should share in the costs of the appeal." Prior to filing the declaratory judgment action, in May, 1990, JUA wrote to Barshak "to keep [him] apprised" of its position in the wake of the jury award of damages against Goldberg: "We continue to hold the view that Ms. Witherspoon's claims are not covered by Dr. Goldberg's policies." It informed Barshak that JUA would "continue to handle Dr. Goldberg's defense, subject to a complete reservation of rights. We also continue to reserve our right to seek recovery of the underlying defense costs."

[19]Appellate counsel advised JUA that it was "concerned that [this case] is an invitation to a broad holding supporting the applicability of [c.] 93A to medical malpractice cases." In addition, "an [A]ppeals [C]ourt is likely to share the view of the trial court that Dr. Goldberg's conduct was

Witherspoon rejected the offer.[20]

Shortly after learning of Witherspoon's rejection, Barshak wrote again to JUA and to American Universal. He expressed his concern about the continuing risk to Goldberg caused by the dispute between the two insurers, and urged them to contribute toward a fund necessary to settle Witherspoon's case "under an escrow arrangement" between them whereby they would be free to litigate against each other to the extent that either one paid funds which the other should have paid. Counsel for JUA responded the next day, to "restate" the coverage position of JUA.[21]

In late April, 1991, Witherspoon informed JUA that she would settle her case for $1,875,000. JUA accepted her offer without any notice to or consultation with Barshak or Goldberg. Indeed, after the last letter to Barshak in December, 1990, there were no further communications to him from JUA. At the time JUA knew that Goldberg continued to insist that his professional liability insurance policies covered the judgment obtained by Witherspoon.

Subsequent to her settlement with JUA, Witherspoon executed a release of all claims against Goldberg, and was dismissed as a defendant in this action. JUA amended its complaint to seek reimbursement from Goldberg for the amount it had paid to Witherspoon, as well as the costs of its

exceptionally bad, and thus appropriate for the application of 93A 'punitive damages.' "

[20]The record is not clear as to whether JUA informed either Barshak or Goldberg prior to its decision to offer $1 million to Witherspoon. After the offer was rejected by Witherspoon, JUA counsel wrote to Barshak to inform him about the offer and its rejection, and reminded him that JUA reserved all rights to pursue recovery personally from Goldberg for any amounts paid to Witherspoon.

[21]He wrote: "Since you have insisted on behalf of your client that the case against Dr. Goldberg be settled, the JUA has attempted to do so (even in the absence of cooperation from American Universal). The JUA has done so however under an express reservation. Should the declaratory judgment action be resolved favorably for the JUA, the JUA will seek to recover from Dr. Goldberg whatever settlement amounts it pays. Therefore, as previously stated, even if there is a settlement with Jessie Witherspoon, the JUA intends to pursue the declaratory judgment action and to seek recovery from Dr. Goldberg of any amount it pays."

defense at trial and on appeal.[22] A two-day bench trial was held in December, 1994. In his subsequent rulings the judge assumed, without reaching the question, that coverage of Witherspoon's claims and settlement payment did not exist under JUA policies. He nevertheless concluded that because Goldberg had not specifically agreed to reimburse JUA for the settlement amount that it had paid to Witherspoon, JUA was not entitled to reimbursement even if it should prevail in its coverage position. The judge also ruled that JUA had breached its duty to defend Goldberg by failing to respond to Witherspoon's pretrial settlement demand. This appeal followed.

## II

JUA insists, as it did below, that this is first and foremost a case about coverage. In its view the determining question is whether a doctor can knowingly engage in the sexual exploitation of a patient and shield himself from the financial consequences of his actions by purchasing professional liability insurance. The conduct in which Goldberg engaged was egregious.[23] But the actions taken by JUA in connection with its settlement with Witherspoon give rise to a different question that must be resolved first: Is JUA entitled to reimbursement for the amount of the settlement that it paid to Witherspoon where Goldberg did not authorize the payment of that amount to her and where he did not agree to reimburse JUA if it prevailed on its coverage position? If the answer is, "No,"

---

[22]On appeal JUA does not press its claim to recover its costs in defending the Witherspoon action.

[23]At the conclusion of the Witherspoon trial, and in connection with his judgment on Witherspoon's G. L. c. 93A claim, the trial judge said: "I find the facts of this case both tragic and egregious. Goldberg, a licensed psychiatrist of some repute, engaged in sexual relations with his patient for over ten years. He knew that his conduct was prohibited by his profession and that the consequences to his patient could be [devastating]. After ten years, he abruptly and unprofessionally terminated his therapeutic relationship with her and manipulated her into signing a release form during a time when she lacked the emotional and mental capacity to understand her actions. His patient was an intelligent and emotionally troubled young woman who relied on his skill as a psychiatrist to provide adequate medical treatment. She was severely injured by his conduct." We have reviewed the Witherspoon trial transcript and related materials in evidence in this action and are of the firm conviction that the judge's description of Goldberg's behavior is correct.

whether or not there is coverage is not relevant. The question is one that we have never addressed, and one which few other courts have addressed.

JUA argues that because it repeatedly communicated to Goldberg that it was proceeding under a reservation of rights, which Goldberg acknowledged, it is entitled to reimbursement. Goldberg responds that, because JUA settled with Witherspoon without his prior approval of the settlement terms, and because he never agreed with JUA's coverage position, he is not required to reimburse JUA.[24] Recognizing that there are no Massachusetts cases on the point, and that there is a paucity of cases from other jurisdictions addressing the issue directly, JUA relies on a respected treatise that states:

> "As a practical matter . . . in the event an insurance company believes, but is not certain, that there is no coverage, it should do one of two things. It should either (a) attempt to stay the [underlying tort] action against the insured and institute a declaratory judgment action, or (b) settle the action against the insured subject to a reservation of rights to seek indemnification from the insured."
> (Footnotes omitted.)

A.D. Windt, Insurance Claims and Disputes § 5.05, at 311-312 (3d ed. 1995). We agree that those are two possible options available to an insurer that is uncertain about coverage.[25] However, the treatise does not address whether a reservation of rights such as the one on which JUA relies here is adequate to support a claim for reimbursement by an

---

[24]Goldberg also argues that reimbursement will not lie because JUA settled with Witherspoon for its own purposes; that JUA never proved what would have been an appropriate amount of settlement, *Liquor Liab. Joint Underwriting Ass'n of Mass.* v. *Hermitage Ins. Co.*, 419 Mass. 316, 323-324 (1995); and that JUA's lack of good faith in conducting settlement negotiations defeats any right to reimbursement it might have.

[25]On appeal JUA argues that it did not have the option of instituting a declaratory judgment action and attempting to stay the Witherspoon action because, it says, the existence of coverage would be determined by the facts — whether Goldberg's misconduct related to covered professional services and whether the misconduct constituted deliberate or intentional wrongdoing — found in the underlying case. We disagree. There is no reason why those facts could not have been determined in a declaratory judgment action, had JUA chosen to initiate such an action earlier than it did.

insurer for a settlement amount paid by it in the circumstances of this case.[26]

JUA points to only two cases from other jurisdictions to support its claim for reimbursement. See *Central Armature Works, Inc.* v. *American Motorists Ins. Co.*, 520 F. Supp. 283, 288 (D.D.C. 1980); *Johansen* v. *California State Auto. Ass'n Inter-Ins. Bur.*, 15 Cal. 3d 9, 18-19 (1975). Neither case is germane. In *Johansen* the insurer had refused to settle a third-party claim within the policy limits, claiming that it would be willing to do so only if it were judicially determined that the policy did in fact provide coverage, which it disputed. The insurer was held liable for wrongful failure to settle when it was subsequently held that coverage did apply. The court rejected the insurer's argument that it could never be reimbursed for a settlement if coverage was contested. Rather, "the insurer retains the ability to enter *an agreement* with the insured reserving its right to assert a defense of noncoverage even if it accepts a settlement offer" (emphasis added). *Johansen, supra* at 19. JUA had no such agreement with Goldberg. Nor is JUA's reliance on *Central Armature Works, Inc.* v. *American Motorists Ins. Co., supra* at 288-289, of any avail. In that case the insurer had declined coverage from the outset and had refused to enter into what both parties agreed was an "excellent" settlement, not the circumstances of this case.

We conclude that JUA cannot sustain its claim for reimbursement. We observe first that the policies at issue do not contain a provision for reimbursement to JUA of any settlement paid by it. Compare *Service Mut. Liab. Ins. Co.* v. *Aronofsky*, 308 Mass. 249, 251 (1941), in which the policy contained such a provision. Nor can JUA point to any other express agreement with Goldberg for reimbursement for any settlement paid by it. JUA argues that the correspondence exchanged between counsel for the parties created an implied

---

[26]The treatise sought to give guidance to an insurer that might be tempted to decline a reasonable settlement offer within policy limits because of its belief that there was no coverage. See *Employers Mut. Liab. Ins. Co.* v. *Sears, Roebuck & Co.*, 621 F.2d 746, 747 (5th Cir. 1980) ("An insurer's settlement with a claimant, if entered voluntarily and with knowledge of facts indicating noncoverage, waives the insurer's defense of noncoverage of the injured tortfeasor unless the insurer otherwise protects its defenses").

agreement for reimbursement.[27] Specifically, it contends that its counsel's letter of March, 1990, to Barshak, and Barshak's response to the letter[28] created an implied agreement that Goldberg would reimburse JUA for any settlement it reached with Witherspoon. We do not agree. Barshak's response makes clear that Goldberg continued to assert — as he had throughout — that Witherspoon's claims were covered by his JUA policies. We cannot infer an agreement to reimburse JUA from a letter which directly challenges JUA's reservation of rights. As the judge noted, this correspondence was, at most, an acknowledgement by Goldberg that any settlement entered into by JUA would not legally jeopardize its position on coverage, including its claimed right to reimbursement. We also fail to find any implied agreement in the later December, 1990, correspondence between the two parties.[29] That exchange merely reemphasized the parties' conflicting positions regarding the policy coverage of Witherspoon's claims.

Where an insurer defends under a reservation of rights to later disclaim coverage, as JUA did here, it may later seek reimbursement for an amount paid to settle the underlying tort action only if the insured has agreed that the insurer may commit the insured's own funds to a reasonable settlement with the right later to seek reimbursement from the insured,

---

[27]Because we find no agreement between the parties that JUA could seek reimbursement from Goldberg for any settlement paid to Witherspoon, we do not address whether an implied agreement between the parties would suffice.

[28]Barshak responded on March 20, 1990: "Dr. Goldberg hereby agrees and hereby expresses to you through me that if you settle the case, the settlement will not be considered a waiver of your reservation of rights (for whatever value the reservation may have). Therefore, please proceed and settle the case."

[29]JUA counsel's letter to Barshak on December 5, 1990, stated that JUA would offer $1 million to Witherspoon "for a limited time after which it will be withdrawn in light of our denial of coverage and filing of the declaratory judgment action . . . . If [Witherspoon] does accept a settlement offer, the JUA is reserving all rights to pursue recovery from Dr. Goldberg personally any amounts paid to Ms. Witherspoon." Barshak responded five days later, reiterating Goldberg's position that the Witherspoon claims were covered, that both JUA and the excess insurance carrier had an obligation to contribute toward the settlement's funding, and that JUA had an obligation to contribute the aggregate amount of coverage available.

or if the insurer secures specific authority to reach a particular settlement which the insured agrees to pay. The insurer may also notify the insured of a reasonable settlement offer and give the insured an opportunity to accept the offer or assume its own defense.[30] None of those conditions was met by JUA. Its original reservation of rights letter sent to Goldberg did not make any reference to settlement or to its right later to claim for reimbursement of any settlement.[31] Nor does the correspondence with Barshak provide the necessary authority. JUA did not notify Goldberg of the settlement offer received from Witherspoon and JUA did not give Goldberg the opportunity to accept that settlement, or to assume his own defense.[32]

There are facts specific to this case that lend further sup-

---

[30]As an example of one other court that has adopted this approach, see *Val's Painting & Drywall, Inc.* v. *Allstate Ins. Co.,* 53 Cal. App. 3d 576, 588-589 (1975). We recognize that *Val's Painting* is a holding from another jurisdiction. We nevertheless find its reasoning sound. JUA argues that this holding has been weakened by more recent decisions by California courts, citing *Walbrook Ins. Co.* v. *Goshgarian & Goshgarian,* 726 F. Supp. 777 (C.D. Cal. 1989). We disagree.

[31]There is a difference between an insurer's reservation of its right to disclaim coverage, which occurred here, and an agreement by the insured that he will reimburse the insurer for any reasonable settlement, which did not occur here. An insurer's reservation of rights is the notification to the insured that the insurer will defend the insured, but that the insurer is not waiving any defenses it may have under the policy, and it protects an insurer from a subsequent attack on its coverage position on waiver or estoppel grounds. *Salonen* v. *Paananen,* 320 Mass. 568, 573 (1947). See *Draft Sys., Inc.* v. *Alspach,* 756 F.2d 293, 296 (3d Cir. 1985); *Crawford* v. *Ranger Ins. Co.,* 653 F.2d 1248, 1252 (9th Cir. 1981). If it disclaims coverage, an insurer who is defending under such a reservation may of course refuse to pay any judgment entered against the insured.

[32]We note the approach of one other court that considered a related question. In *Maryland Cas. Co.* v. *Imperial Contr. Co.,* 212 Cal. App. 3d 712 (1989), an insurer had, under a reservation of rights, requested authority and agreement from its insured to participate in a settlement with a third-party claimant. The insured refused to consent. The insurer then filed a motion for declaratory relief concerning its authority to participate in the settlement without the insured's consent, and the trial court granted it the right to settle the underlying case. On appeal challenging that order, the appellate court affirmed the trial court, concluding that an insurer in such a situation has three options: it can turn over the defense to the insured and await the outcome of the declaratory relief concerning coverage; it can relinquish its earlier reservation of rights and acknowledge coverage; or it can seek court approval of the proposed settlement if the insured refuses to

port to our conclusion. The judge ruled that JUA breached its duty to defend Goldberg because of its failure to conduct good faith settlement negotiations with Witherspoon. In light of our decision that JUA required Goldberg's agreement to settle the case with Witherspoon on specific terms, we are not required to reach that issue. There is, however, one aspect of the settlement between JUA and Witherspoon that is relevant here. The judge found that JUA settled with Witherspoon to cut its own potential exposure should its coverage position not prevail. We are of a similar view. The issue that Witherspoon raised in her appeal, pending at the time of settlement, was the applicability of G. L. c. 93A to medical malpractice suits. Resolution of that issue by an appellate court had significant consequences for JUA, as JUA's appellate counsel advised it; there were risks to JUA that went beyond the liability exposure in this case. Because "the facts of this case make it difficult to argue for a narrow interpretation of [c.] 93A in the malpractice context," appellate counsel advised JUA, Witherspoon's claim was an "invitation" for an appellate court to "develop new law unfavorable to the JUA in other cases." Appellate counsel advised that "it was more likely than not that an appeals court will hold that [c.] 93A should apply [to medical malpractice cases.]" Appellate counsel also told JUA that American Universal was in serious financial trouble, so there was increasing risk that it would not be able to contribute to any payment to Witherspoon. JUA also faced the possibility that, were treble damages to be awarded to Witherspoon on her claim that Goldberg had improperly failed to engage in good faith settlement discussions with her, JUA itself was at risk, as Goldberg could then look to JUA as the party responsible for that failure.[33]

JUA did not engage in serious settlement negotiations with Witherspoon until it received this advice from its appellate counsel. The judge observed, and we agree, that JUA settled to

authorize the settlement. JUA had similar options here, none of which it exercised.

[33]JUA also had a duty to Goldberg's excess insurer to settle the case within the primary policy limits when it had the opportunity to do so. *Hartford Cas. Ins. Co.* v. *New Hampshire Ins. Co.*, 417 Mass. 115, 116 (1994). If Goldberg had succeeded on any counterclaim that JUA had breached its duty to him for its failure to engage in good faith settlement negotiations, JUA could have been substantially at risk to American Universal.

protect its interests, and not the interests of Goldberg. Settlement (and any discussions which preceded) occurred without Goldberg's knowledge. Having done so, it is not entitled to reimbursement from Goldberg. We do not accept JUA's claim that an insured can "whipsaw" an insurer by demanding that it settle the case (as Goldberg did here) while, at the same time, refusing to agree to reimburse the insurer should it be determined that there is no coverage for the claims asserted.[34] Once JUA had negotiated the best offer from Witherspoon (arguably $1,875,000 after judgment had entered for Witherspoon), it could have asked Goldberg for authority to pay that amount. JUA could also have sought an agreement from Goldberg that it would settle the lawsuit, as Goldberg had instructed, only if Goldberg agreed to reimburse JUA if its coverage position were sustained.[35] JUA pursued neither option.

Because JUA is not entitled to reimbursement from Goldberg, we do not decide whether the Witherspoon claims are covered under JUA's policies.[36] Accordingly, there is no need

[34]JUA argues that a rule permitting reimbursement in the circumstances of this case would serve an important public policy of favoring the settlement of cases. Promoting the settlement of disputes is desirable. See, e.g., *Polaroid Corp.* v. *Travelers Indem. Co.*, 414 Mass. 747, 765 (1993) (settlement of disputes is "a worthy goal because of court congestion"). But we do not believe that requiring the insured's consent to a settlement agreement as a prerequisite to reimbursement significantly impedes this policy.

[35]Compare *Great Am. Ins. Co.* v. *Raque*, 448 F. Supp. 1355, 1358 (E.D. Pa. 1978), aff'd, 591 F.2d 1335 (3d Cir. 1979), in which the insurer agreed with the insured to pay the third-party plaintiff where the parties also agreed that the tender of the check by the insurer did not constitute an admission of coverage under the insurance policy and the insurer reserved all rights to seek indemnification for the settlement amount from the insured.

[36]In *Roe* v. *Federal Ins. Co.*, 412 Mass. 43 (1992), we concluded that a dentist's professional liability policy did not provide coverage for his acts of sexual misconduct. In that case we discussed cases from other jurisdictions which involved malpractice claims against psychiatrists where the injuries were found to be caused by the negligent mishandling of what is referred to as the "transference phenomenon," *id.* at 50, the claim that Goldberg asserts here. The evidence in this case was that Goldberg's sexual exploitation of Witherspoon was both deliberate and intentional and continued after Witherspoon was no longer a patient of his. We are doubtful, even were we to recognize an exception to liability for the sexual activities of a psychotherapist with a patient because of "mishandling" of the transference phenomenon, that any such exception would apply here.

for us to address the claims asserted by JUA against American Universal and the Massachusetts Insurers Insolvency Fund.

*Judgment affirmed.*