CAROLYN SWIFT & another[1] *vs.* FITCHBURG MUTUAL
INSURANCE COMPANY.

No. 97-P-1671.

Bristol. April 9, 1998. - October 9, 1998.

Present: BROWN, KAPLAN, & PERRETTA, JJ.

*Insurance,* Homeowner's insurance, Defense of proceedings against insured,
Insurer's obligation to defend. *Contract,* Insurance, Indemnity. *Indemnity.*

An insurer breached its duty to defend its insured in a civil action alleging
that the plaintiffs were injured by the insured as a result of the insured's
negligent failure to take his medication as prescribed [622-624], and the
"criminal acts" exclusion was inapplicable to such negligence claims
[626].

The words "criminal acts" in an exclusion from liability clause in a policy of
homeowner's insurance were ambiguous as applied to the acts of the
insured, who was found not guilty by reason of insanity in a criminal case
arising from those same acts; accordingly, the clause was strictly interpreted
against the insurer and in favor of plaintiffs injured by the insured's acts,
who sought to reach and apply policy benefits after recovering against the
insured. [624-625, 626-628]

A claim that an insurer violated the insurance law, G. L. c. 176D, § 3(9), and
the consumer protection act, G. L. c. 93A, § 2, was remanded for trial.
[628-629]

CIVIL ACTION commenced in the Superior Court Department on
September 26, 1996.

The case was heard by *John J. O'Brien,* J., on motions for
summary judgment.

*George P. Field (Thomas P. Gay* with him) for the plaintiffs.
*Stephen M.A. Woodworth* for the defendant.

KAPLAN, J. We hold that the defendant insurer under a home-
owners policy was in breach of the contract and, the "criminal
acts" exclusion being inapplicable, is liable for expenses
incurred by the insured in responding to a third-party suit and
for the amount of the judgment against the insured in that suit.

[1]Anne Francis.

## NARRATIVE

1. On February 12, 1994, the plaintiff Anne Francis (then seventy-seven years old) and her daughter, the plaintiff Carolyn Swift, were at their home in Rehoboth. Ralph Goff, Jr., forty-one years old, had driven to their house in his truck that morning and was asked in for lunch. (Goff's mother resided nearby and Goff occasionally did carpentry work around the plaintiffs' house.) After lunch, Goff intended to drive off but found his truck stuck in the snow in the plaintiffs' driveway. Francis offered to call Goff's uncle for assistance; unable to reach the uncle, she left a message at Goff's mother's house. Goff, waiting outside, kept coming to the door of the sun porch to check with Francis about when his uncle would arrive. He became increasingly irritated while questioning Francis: he got "madder and madder. His hands were going." Finally, he called Francis a "liar" and broke in the door of the sun porch.

Francis rushed outside to get past Goff. Goff knocked her down in the snow. Then he entered the house, broke through an interior door, found Swift and slashed her in the leg with a utility knife. Swift fled upstairs. Meanwhile Francis was outside in the road trying to summon help. A car driving by slowed down, but sped off on seeing Goff approach Francis with a knife in one hand and a long-handled shovel in the other. He did not speak but struck Francis in the head with the shovel. As Swift emerged from the house Goff struck her with the shovel until it snapped.

Goff's uncle then arrived with a friend. Attempting to subdue Goff, the uncle was met with a knife slash to the ear. As the friend interceded, police arrived and placed Goff under arrest. The plaintiffs received medical attention: Swift for lacerations in the right thigh and left knee, Francis for multiple injuries to her hand, face, and body resulting in hospitalization for three days. Both women were damaged psychologically.[2]

Goff for his part was charged with and arraigned in Taunton District Court on eight counts to which he pleaded not guilty. Pending trial he was held without bail at Bridgewater State Hospital. It appears that sometime before the attack he had been admitted to a two-week outpatient program for mental problems at Fuller Memorial Hospital and was prescribed an antidepres-

---

[2]The account of the incident is drawn from the testimony of Francis in the civil action (see item 3 of Narrative below).

sant medication, Imipramine. But he had stopped taking this medication by the time of the attack.

2. An attorney representing Swift wrote to Goff's wife on May 25, 1994, mentioning his representation and suggesting that she pass his letter to her insurance company as her insurance might cover the injuries that were due to "Mr. Goff's diminished mental capacity." The Goffs owned a home in Taunton and were coinsured on a homeowners policy of defendant Fitchburg Mutual which provided "personal liability coverage" up to $300,000 subject to certain exclusions. Mrs. Goff's insurance agent on May 31, 1994, sent the company a "general liability notice of occurrence/claim" with the attorney's letter attached. On October 24, 1994, the company in a letter to the Goffs' attorney denied coverage on the basis of a policy exclusion which stated that coverage did not extend to bodily injury or property damage "which is expected or intended by the 'insured.' "[3]

3. On November 15, 1994, Swift and Francis filed a complaint against Ralph Goff, Jr., in Taunton District Court (hereafter sometimes called the "civil action"): counts I and III alleged that the defendant had committed an assault and battery against the respective plaintiffs; counts II and IV alleged that the injuries sustained by the respective plaintiffs were the result of the defendant's negligence, in that he failed to take his medication when he knew or should have known that he "had a propensity to become irate and uncontrollable if he failed to take his medication as prescribed." A copy of the complaint was sent to Fitchburg Mutual.

An attorney representing the Goffs on January 13, 1995, wrote to Thomas Noonan, casualty claims supervisor at Fitchburg Mutual, stating that denial of coverage "based on the intended acts of Mr. Goff" was dubious where there was "a serious question as to whether or not Mr. Goff had the mental capacity to intentionally commit the acts alleged." Goff, counsel pointed out, had now been confined to Bridgewater State Hospital for almost a year and the company had "insufficiently documented that Mr. Goff's acts were intentional and premeditated." Counsel asked the company to reconsider its denial of coverage and said failure fully to investigate the incident and prematurely to deny coverage would give rise to a claim under

---

[3]This appeared in the body of the policy. It had in fact been superseded by an endorsement quoted in item 3 of Narrative below.

G. L. c. 93A and c. 176D. (Apparently the attorney for Swift and Francis had also communicated with the company regarding coverage.) On January 19, 1995, Noonan wrote to the plaintiffs' attorney and also to the Goffs' attorney. To the latter Noonan wrote, "[W]e do not owe [Goff] a defense nor will we indemnify any judgment relative to the incident which occurred on 2/12/94." Now Noonan referred to "endorsement FMHO-915 (7-92)" which stated that coverage was excluded for bodily injury or property damage which "may reasonably be expected to result from the intentional or criminal acts of an 'insured' or which in fact are intended by an 'insured.' " (See note 3, *supra.*) The January 19, 1995, letter to the plaintiffs' attorney was to similar effect.

4. Five days later, on January 24, 1995, Goff was found "not guilty by reason of mental illness" in the District Court prosecution on two counts of assault and battery with a dangerous weapon upon a person aged more than sixty-five years, and one count of breaking and entering in the daytime, with "nolle prosequi in the interest of justice" on five other criminal counts. Goff was ordered to Bridgewater State Hospital for forty days for the "observation and examination" called for by G. L. c. 123, § 16(*a*).

The company was notified of the disposition of the criminal proceeding and on May 9, 1995, the Goffs' attorney sent a c. 93A demand letter asserting that the company should have known that it had an obligation to defend Goff in the civil action and that it could not rely on an exclusion where the company's position was "contrary to both the court's and Bridgewater State Hospital's conclusions." The letter also demanded that Fitchburg Mutual pay any judgment awarded to the plaintiffs in the civil action and costs incurred by Goff in defending that action. This drew a response from Noonan which, besides denying any c. 93A violation, offered "in the spirit of compromise" to review the medical records at Bridgewater and to "research the impact a medical condition has on insurance coverage." Goff's attorney then sent Noonan a report of Dr. Petrou regarding Goff's mental capacity at the time of the incident; in the doctor's "conclusion and opinion, Mr. Goff lacked any ability to formulate a criminal intent."[4] There was no further response from the company.

---

[4] The report itself has not been reproduced in the record.

5. The plaintiffs Swift and Francis and the defendant Goff in the civil action agreed to go forward on the negligence counts of the complaint.[5] Upon the plaintiffs' "motion for assessment of damages," a hearing was held in which they introduced as documentary evidence bearing on Goff's negligence, a psychiatrist's report where Goff is recorded as stating, "he thought he was well enough to stop taking Imipramine; until then he was 'doing fine.' " Also introduced were photographs of the plaintiffs' injuries and their medical and counseling records (revealing stress and depression following the incident). The plaintiff Francis testified to the incident.

On June 10, 1996, the judge "so found" certain proposed findings; included among them: Goff had a history of psychological problems for which he had been placed on medication; his failure to take his prescribed medication was the proximate cause of his losing control and attacking the plaintiffs; this failure amounted to negligence on Goff's part; the plaintiffs were entitled to monetary damages: on count II (negligence) the judge found for Swift for $36,899, and on count IV (negligence) for Francis for $51,938. Judgment entered on July 24, 1996, for damages assessed and interest, in total $107,307.15.

6. On September 26, 1996, the plaintiffs commenced the present action (with jury demand) in Bristol Superior Court, against Fitchburg Mutual. The plaintiffs charged the insurer with breach of duty to furnish the insured with defense in the third-party action (count II) and to indemnify the insured for the judgment therein, subject to the plaintiffs' right to reach and apply (count I). In count III, the plaintiffs complained of unfair and deceptive practices by the insurer in handling claims under the policy. The company answered, denying liability.

In due course, on April 4, 1997, the plaintiffs moved for (partial) summary judgment on counts I and II. The materials available on the motion comprised the essentials of the story as set forth above. As pictured to, and known by the insurer, the circumstances were that the insured, by his neglect, was driven into an irrational frenzy and in the course of it did bodily injury to the plaintiffs. (The plaintiffs cannot claim strict res judicata benefits from the "not guilty by reason of mental illness" find-

---

[5]Goff assigned to the plaintiffs his "rights against his insurance company, and [the plaintiffs] are waiving all rights to go against Mr. Goff personally or his property." The plaintiffs executed a release and discharge of an attachment on the Goffs' house.

ing or the findings in the civil action,[6] but point to the underlying facts.)

Despite due demands, the insurer refused to come in to defend the insured in the civil action. It denies any duty to defend or indemnify the insured, and contends that the "criminal acts" exclusion in the policy applies, and extends even to this case where the insured is taken to have acted uncontrollably without capacity to form a criminal intent.

The motion judge accepted the defendant's contention: he simply read the words "criminal acts" as the equivalent of the "actus reus" (evil act), whether "mens rea" was present becoming irrelevant. As the insured performed the physical acts that produced the injuries, it should make no difference, the judge thought, that the insured was mentally irresponsible at the time. This reading, according to the judge, swept other considerations off the board, so he not only denied the plaintiffs' motion for partial summary judgment, but, under Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974), allowed the defendant summary judgment dismissing all counts of the complaint. From this judgment the plaintiffs appeal.

## ANALYSIS

The weaknesses in the judge's sweeping approach are best exposed count by count of the present action.

1. *Breach of duty to provide defense.* Count II of the present action comprises a charge of breach by the insurer of its homeowner's policy in that it refused to provide the insured, Goff, with a defense of a civil action against him; the immediate consequence of the breach would be the incurring by the insured of the expense of suit.[7]

As noted, counts II and IV of the civil action were grounded in the insured's negligence.[8] A suit so based invoked the insurer's duty to come in and defend; such is, indeed, of the essence of the homeowners policy.

---

[6]In one respect the judgment in the civil action should be taken as conclusive — the amount of the damages assessed upon the proofs presented. See *Preferred Mut. Ins. Co.* v. *Gamache*, 42 Mass. App. Ct. 194, 201-202, *S.C.*, 426 Mass. 93 (1997).

[7]The present plaintiffs here assert the rights of the insured by virtue of the assignment of rights above mentioned.

[8]See *Arvanitis* v. *Hios*, 307 N.J. Super. 577, 586 (1998), where a negligence action was maintained against one who failed to take medication and thereby

Confronting a civil complaint alleging negligence, the insurer's duty to defend was plain, but so was it if the complaint was read simply to charge the insured with committing bodily injuries on the plaintiffs while and because he was mentally disabled.[9]

The court said in *Doe* v. *Liberty Mut. Ins. Co.*, 423 Mass. 366, 368-369 (1996): "It is well settled in this jurisdiction that a liability insurer owes a broad duty to defend its insured against any claims that create a potential for indemnity. *Liberty Mut. Ins. Co.* v. *SCA Servs., Inc.*, 412 Mass. 330, 332 (1992). The duty to defend is broader than the duty to indemnify as an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. *Boston Symphony Orchestra, Inc.* v. *Commercial Union Ins. Co.*, 406 Mass. 7, 10 (1989). 'If the allegations of the [third-party] complaint are "reasonably susceptible" of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense.' *Liberty Mut. Ins. Co.* v. *SCA Servs., Ins.*, *supra* at 331-332, quoting *Sterilite Corp.* v. *Continental Casualty Co.*, 17 Mass. App. Ct. 316, 318 (1983)." "[O]ur task is to match the complaint against the polic[y]." *Smartfoods, Inc.* v. *Northbrook Property & Cas. Co.*, 35 Mass. App. Ct. 238, 241 (1993). Compare *Preferred Mut. Ins. Co.* v. *Gamache*, 42 Mass. App. Ct. 194, 202, *S.C.*, 426 Mass. 93 (1997) (insurer had duty to defend insured who attacked police officer where complaint alleged injuries that were the result of "negligent, reckless, and/or wanton conduct").[10] We add the observation in *Sterilite*, 17 Mass. App. Ct. at 319 n.5, that "even where the

---

became violent and inflicted injury on the plaintiff. Cf. *Stuyvesant Assocs.* v. *Doe*, 221 N.J. Super. 340 (1987).

[9]As a general rule, mentally disabled persons are liable for their torts (they are held to the standard of a reasonable person in the circumstances). See Restatement (Second) of Torts § 283B (1965); Prosser & Keeton, Torts § 135 (5th ed. 1984). See the discussion by Justice Qua in *McGuire* v. *Almy*, 297 Mass. 323 (1937). Cf. *Baker* v. *Commercial Union Ins. Co.*, 382 Mass. 347 (1981).

However, "[w]hile acts performed by an insane person do not relieve that person of civil liability for the consequences of [his] actions (see Prosser, Torts § 135 [4th ed. 1971]), a different rule is applied when considering whether such actions are 'intentional' within the meaning of an exclusionary provision in an insurance policy." *Aetna Cas. & Sur. Co.* v. *Dichtl*, 78 Ill. App. 3d 970, 975 (1979).

[10]The present policy states: "Coverage E — Personal Liability. If a claim is made or a suit is brought against an 'insured' for damages because of 'bodily

complaint itself does not cast on the insurer a duty to defend," the insurer is so obligated "if it knows or reasonably could ascertain facts that implicate such a duty." See *Desrosiers* v. *Royal Ins. Co. of America,* 393 Mass. 37, 40 (1984); *Boston Symphony Orchestra, Inc.* v. *Commercial Union Ins. Co.,* 406 Mass. at 10-11.

Here the insurer had the civil complaint in hand, and much information besides.

The defendant insurer seeks to absolve itself of a duty to defend by referring to its own claim of an exclusion from coverage. The insurer could have protected its position by well established procedures: say by attempting to stay the underlying action and seeking a declaration about the claimed exclusion, or by settling the underlying action subject to a reservation of rights to seek indemnification from the insured. See *Medical Malpractice Joint Underwriters Assn. of Mass.* v. *Goldberg,* 425 Mass. 46, 56 (1997). See also *Lee* v. *Aetna Cas. & Sur. Co.,* 178 F. 2d 750, 752 (2d Cir. 1949) (L. Hand, C.J.). "What is not permitted is that an insurer shall escape its duty to defend the insured against a liability arising on the face of the complaint and policy, by dint of its own assertion that there is no coverage in fact: the insurer then stands in breach of its duty even if the third party fails in the end to support any such claim of liability by adequate proof." *Sterilite,* 17 Mass. App. Ct. at 324.

On undisputed facts the insurer was in breach of its obligation to defend.

2. *Further consequences of breach of duty.* Count I asserts in effect that the insurer's breach of duty results in the insurer's becoming liable to indemnify the insured, Goff, for the amount of the judgment against him in the civil action; and the present plaintiffs may reach and apply the insurance money to satisfy the judgment (see G. L. c. 175, §§ 112, 113; c. 214, § 3, ninth clause).

Until recently it could plausibly be thought the law of the

injury' . . . caused by an 'occurrence' to which this coverage applies, we will: . . . 2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent . . . ."

"Occurrence" is defined as "an accident . . . which results during the policy period, in: a. 'Bodily injury' . . ."

"Occurrence" and "accident" have been broadly construed, see *Gamache,* 42 Mass. App. Ct. at 197; *Quincy Mut. Fire Ins. Co.* v. *Abernathy,* 393 Mass. 81, 83 (1984), and easily accommodate the civil action.

Commonwealth — as, indeed, it may be the governing law at present in a number of other jurisdictions — that "if an insurer in breach of its obligation to defend a claim declines to defend that claim, the insurer must pay the amount of any reasonable settlement that the insured makes, without regard to whether the claim was one for which coverage was provided." *Polaroid Corp.* v. *Travelers Indem. Co.*, 414 Mass. 747, 760 (1993). However, we read the *Polaroid* case as deciding — upon analysis on strict contract principles — that an insurer thus in breach may, in given situations, still be entitled to show the breach was not a "cause" of the settlement, as can be the case where the underlying claim was outside the coverage of the insurance policy. See 414 Mass. at 762. But the court was clear that "an insurer that wrongfully declines to defend a claim will have the burden of proving that the claim was not within its policy's coverage." 414 Mass. at 764. See *Palermo* v. *Fireman's Fund Ins. Co.*, 42 Mass. App. Ct. 283, 290 (1997). See also *Liquor Liab. Joint Underwriting Assn. of Mass.* v. *Hermitage Ins. Co.*, 419 Mass. 316, 323 (1995). The contours of the *Polaroid* doctrine are still unclear (the court itself so observed, at 766 n.23) and we are uncertain whether it should apply to the present situation so as to afford the insurer an opportunity to show noncoverage.[11] But out of abundant caution we shall assume the doctrine does apply. On that footing, the burden cast on the insurer by *Polaroid* is twice aggravated in the present case. The insurer tries to show that the "criminal acts" exclusion[12] denies coverage even where the insured was mentally irresponsible at the crucial time. So the insurer has to contend with the rule that exclusionary policy clauses are to be strictly interpreted against the insurer, and with the further rule that doubts created by ambiguous terms in a policy are to be resolved against the insurer. See *Liquor Liab. Joint Underwriting Assn. of Mass.*, 419 Mass. at 322; *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. 318, 324 (1991).

---

[11]In *Polaroid*, "We consider the issue in the circumstances of this case where the insurers have demonstrated *conclusively* that the Cannons claims were not covered under the policies issued to Polaroid" (emphasis added), at 760, and "Polaroid makes no claim that it was forced to settle the Cannons claims because its insurers had declined to defend those claims," at 762. The present case does not conform to the first model and may differ from the second.

[12]The "intentional . . . acts" exclusion has been given a stringent, limited interpretation in the *Gamache* case; it may be for that reason, if no other, that the insurer has not invoked that exclusion in its argument.

a. *The case seen as one based on negligence.* As pleaded and as supported in the narrative, the civil action laid stress on the insured's negligence as the foundation of the claim (see note 8, *supra*). When the suit is considered in this intrinsic character, any "criminal acts" exclusion appears irrelevant and the case for the insurer is foreclosed. Compare *Allstate Ins. Co. v. Brown*, 834 F. Supp. 854, 858 (E.D. Pa. 1993), where the policy exclusion was irrelevant on its face to the third-party action so far as it pleaded negligence on the part of the insured (although possibly relevant to other theories pleaded).

b. *Suppose the origin of the case in negligence is disregarded.* Suppose we blinker our perception of the case, disregard its beginning in the insured's neglect of medication, and focus simply on the episode in which the insured, mentally disabled at the time, attacked the plaintiffs. In this view of the case the "criminal acts" exclusion is also inapplicable.

The motion judge made a brisk assertion on the face of things, without explanation, that "criminal acts" means the actus reus without any ingredient of a mental element: thus, although the insured herein is taken to be not guilty of the three offenses named, or of any other, he has, according to the judge, still committed a criminal act within the exclusion. We question whether this is the unambiguous interpretation of "criminal acts."

(i) Another (and perhaps more natural) reading is that the insured must have been guilty (whether or not actually convicted) of an offense as defined in the relevant criminal code. (ii) If one assumes the rather scholastic actus reus/mens rea formulation, it is natural to reason that the actus reus must have been voluntary (knowing), and where the actor is mentally disabled, that element is lacking. (iii) It is, indeed, hard to make out what, precisely, the judge had in mind. The insurer seems to think the judge interpreted "criminal acts" — the actus reus, in the judge's view — as referring to acts generally deemed immoral or blameworthy, and the insurer tries to justify this usage by citing to variant dictionary definitions of the adjective "criminal" in that sense. We question whether this can serve as the meaning of "criminal acts," and anyway, if that meaning were adopted, it would misfire when sought to be applied to an insured incapable of rational judgment. (iv) In searching for an understanding of "criminal acts" in the present context, one needs to reflect on the main purpose of the exclusion. The

purpose has been to forbid insurance protection of criminal activities and thereby to discourage such activities. It is questionable whether that purpose is served by denying protection to an insured who was incapable of forming a criminal intention.

We may reckon that the exclusion admits of another meaning than that assumed by the motion judge.

The insurer cites a half dozen decisions applying criminal acts exclusion clauses.[13] The decisions are remote in their circumstances from the present, for the insureds were taken to be guilty of their respective crimes (they had pleaded or been found guilty or were assumed guilty) and none of the insureds was claimed to be mentally infirm. So "criminal" as applied to the facts could be thought unambiguous. A question of some interest is whether the insured, in order to suffer the exclusion and lose the protection of the insurance policy, must have envisioned bodily injury of the third-party as a result of the offense. Suppose an insured is guilty of intentionally resisting arrest in course of which he injures a police officer: did the exclusion apply where the insured did not intend the injury? See *Allstate Ins. Co.* v. *Sowers*, 97 Or. App. 658, 661 (1989). There are decisions in this situation in the affirmative — this would conform to an objective reading of the words — "which may reasonably be expected to result from" — that precede the reference to "criminal acts" in our policy clause. Such decisions, whether right or wrong, can be accepted without affording any comfort to the insurer in the present case, where guilt and a functioning mind were absent. In situations where the offense of which the insured was guilty verges toward the unintentional — say criminal negligence or recklessness — courts might possibly hesitate about holding that the criminal acts exclusion applies, for here the historic justification for the exclusion falters. See *Allstate Ins. Co.* v. *Zuk*, 78 N.Y.2d 41, 46-47 (1991); *Tower Ins. Co.* v. *Judge*, 840 F. Supp. 679, 692-693 (D. Minn. 1993); *Young* v. *Brown*, 658 So. 2d 750, 753-754 (La. Ct. App. 1995). But cf. *Allstate Ins. Co.* v. *Barnett*, 816 F. Supp. 492, 497 (S.D. Ind. 1993).

[13]*Allstate Ins. Co.* v. *Travers*, 703 F. Supp. 911 (N.D. Fla. 1988); *Hooper* v. *Allstate Ins. Co.*, 571 So. 2d 1001 (Ala. 1990); *Allstate Ins. Co.* v. *Juniel*, 931 P.2d 511 (Colo. 1996); *Liebenstein* v. *Allstate Ins. Co.*, 517 N.W.2d 73 (Minn. App. 1994); *Allstate Ins. Co.* v. *Schmitt*, 238 N.J. Super. 619 (1990); *Allstate Ins. Co.* v. *Sowers*, 97 Or. App. 658 (1989).

We turn to the human reagent, an hypothesized insured who is regularly used to gauge what expectations are generated by provisions of insurance policies: it is "appropriate that we consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Hakim* v. *Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275, 282 (1997). At most for the insurer, we think the insured in our case would say there is not one single self evident meaning of the words "criminal acts" in the context of the policy. Perhaps the meaning ascribed by the motion judge and the insurer is one plausible meaning. But an at least equally plausible meaning (indeed, we guess the insured would say the more plausible meaning) is that a person who is not convicted, or convictable, of a crime has not committed a criminal act, or that a person who is incapable of rational thinking or action at the time has not committed a criminal act. We think, further, that it would weigh with the insured in defining his expectation of coverage that the effect of adopting the insurer's interpretation would be to deny protection under a liability policy to a guiltless policyholder as well as to innocent victims, which might appear a strange and unseemly result.

We conclude that the insurer cannot sustain the burdens earlier mentioned that were laid upon it.

An afterword. Perhaps conscious that the usual criminal acts clause might be found at least unclear, a draftsman on the side of an insurance company propounded the provision quoted in the margin,[14] which is evidently aimed specifically at denying coverage even where an insured may have presented unrebutted evidence of lack of mental capacity and has been acquitted of a crime. It is noteworthy, however, that in *Allstate Ins. Co.* v. *Patterson*, 904 F. Supp. 1270, 1286 (D. Utah 1995), the court gave rather unfriendly treatment to the provision, and in *Cary* v. *Allstate Ins. Co.*, 130 Wash. 2d 335, 340-347 (1996), the provision was questioned on grounds of public policy (but upheld).

3. *Possible c. 93A liability.* The plaintiffs did not seek sum-

---

[14]"We do not cover bodily injury or property damage resulting from: (a) A criminal act or omission; or (b) An act or omission which is criminal in nature and committed by an insured person who lacked the mental capacity to appreciate the criminal nature or wrongfulness of the act or omission or to conform his or her conduct to the requirements of the law or to form the necessary intent under the law. This exclusion applies regardless of whether the insured person is actually charged with, or convicted of, a crime."

mary judgment on count III of the complaint charging the insurer with unfair and deceptive practices in violation of the insurance law, G. L. c. 176D, § 3(9), and connected provisions of the consumer protection act, G. L. c. 93A, § 2. (This count alleged by the plaintiffs is by the assignment from the insured.) The particular facts about the insurance company's handling and rejection of the plaintiffs' claims under the homeowners policy have not been explored sufficiently of record to warrant a conclusion on either side and must remain for trial on remand.

*Conclusion.* The judgment appealed from is reversed, and judgment shall enter for the plaintiffs (1) on the duty to defend claim (count II), with damages to be assessed on remand, and (2) on the reach and apply claim (count I) for the amount of the judgment in the civil action. The c. 93A claim (count III) is remanded for trial.[15]

*So ordered.*

---

[15]Counsel fees incurred on the side of the insured in connection with the civil action may figure as damages for the insurer's breach of the duty to defend.

The *Gamache* decision, 426 Mass. at 98, as an exception to the "American" rule, allows recovery of counsel fees by the prevailing insured in an action such as this to vindicate insured's rights.