Carol CREASY, Appellant–Plaintiff,

v.

Lloyd RUSK, Appellee–Defendant.

No. 08A02–9709–CV–604.

Court of Appeals of Indiana.

June 29, 1998.

Rehearing Denied Aug. 13, 1998.

Edgar W. Bayliff, Ronald S. Todd, Bayliff, Harrigan, Cord & Maugans, P.C., Kokomo, for Appellant–Plaintiff.

Stephen C. Wheeler, Renae L. Hermann, Jennings Taylor Wheeler & Bouwkamp, P.C., Carmel, for Appellee–Defendant.

## OPINION

KIRSCH, Judge.

Carol Creasy appeals the grant of summary judgment in favor of Lloyd Rusk in Creasy's action for personal injuries she suffered while caring for Rusk in a health care facility. The issues we must decide are:

I. Whether a person who is institutionalized with a mental disability owes a duty of care to his caregiver to refrain from conduct that results in injury to the caregiver.

II. Whether genuine issues of material fact exist precluding summary judgment on the question of whether any duty was breached.

III. Whether genuine issues of material fact exist precluding summary judgment on the question of fault allocation.

We reverse.

## FACTS AND PROCEDURAL HISTORY

Lloyd Rusk was admitted to the Brethren Healthcare Center (BHC) in July 1992 with a primary diagnosis of Alzheimer's Disease. He was admitted to the facility because he suffered from memory loss and confusion, and his wife was unable to care for him. While at BHC, Rusk was anxious, confused, disoriented, and agitated. On several occasions, he resisted when staff members attempted to remove him from areas of the facility where he did not belong. On other occasions, Rusk was belligerent and combative with both staff and patients. In particular, Rusk was often combative, agitated, and aggressive and would hit at staff members while they cared for him.

Creasy was a certified nursing assistant employed at BHC. Creasy's duties required her to care for patients with Alzheimer's, including Rusk. She attended a short BHC presentation concerning the pathological effects of Alzheimer's, but had not otherwise received special training on how to care for those with the disease. Creasy had been bruised on several occasions by patients with Alzheimer's, and she knew that Rusk suffered from Alzheimer's.

On May 16, 1995, Creasy and Linda Davis, another certified nursing assistant employed at BHC, attempted to put Rusk to bed. Creasy was aware that Rusk had been "very agitated and combative that evening." *Record* at 228. According to Creasy:

"[Davis] was holding [Rusk's] wrists to keep him from hitting [them] and [Creasy] was trying to get his legs to put him in bed. He was hitting and kicking wildly. During this time, he kicked [Creasy] several times in [her] knee and hip area. [Her] lower back popped and [she] yelled out with pain from [her] lower back and left knee."

*Record* at 228.

Creasy filed a civil suit against Rusk, seeking monetary damages for injuries she suffered as a result of the incident. The trial court granted Rusk's motion for summary judgment concluding that Rusk did not owe a duty to Creasy, that Creasy incurred the risk of her injuries, that Creasy's comparative fault exceeded all other fault proximately contributing to her injuries, and that Creasy had failed to bring forth evidence that Rusk had breached any duty owed to her. Creasy appeals.

## DISCUSSION AND DECISION

The purpose of summary judgment is to end litigation about which there can be no factual dispute and which may be determined as a matter of law. *Sizemore v. Arnold,* 647 N.E.2d 697, 698 (Ind.Ct.App.1995). When reviewing a decision on a summary judgment motion, this court applies the same standard as does the trial court. *Wickey v. Sparks,* 642 N.E.2d 262, 265 (Ind.Ct.App.1994), *trans. denied* (1995). Thus, we are not bound by the findings and conclusions entered by the trial court when ruling on a motion for summary judgment as we base our decision upon the Trial Rule 56(C) materials properly presented to the trial court. *Campbell v. Spade,* 617 N.E.2d 580, 582–83 (Ind.Ct.App.1993). Summary judgment shall be granted if the designated evidentiary matter demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C); *Barga v. Indiana Farmers Mut. Ins. Group, Inc.,* 687 N.E.2d 575, 576 (Ind.Ct.App.1997), *trans. denied* (1998). In determining whether summary judgment is appropriate, all facts and reasonable inferences must be construed against the moving party. *Wickey,* 642 N.E.2d at 265.

## I. DUTY

The issue we must decide has not been directly addressed in Indiana: Does a person institutionalized with a mental disability owe a duty to his caregiver to refrain from conduct that results in injury to the caregiver? The parties argue for and against the wisdom of adopting a general rule, used in several other jurisdictions, that mentally disabled individuals be held liable for their tortious activities without regard to the individuals' mental capacity to control their actions or understand the consequences thereof. Such a general rule is embodied in the Restatement (Second) of Torts which provides: "Unless the actor is a child, his insanity or other mental deficiency does not relieve the actor from liability for conduct which does not conform to the standard of a reasonable man under like circumstances." RESTATEMENT (SECOND) OF TORTS § 283B (1964). While the Restatement uses the reasonable man standard for adults, regardless of their mental capacity, the standard of conduct for a child is "that of a reasonable person of like age, intelligence, and experience under like circumstances." *Id.* § 283A. Such a standard takes a child's mental capacity into account. *Id.* § 283B cmt. a.

With regard to children, Indiana has incorporated the Restatement standard into a three-tiered analysis. The three tiers are:

"[C]hildren under the age of 7 years are conclusively presumed to be incapable of being contributorily negligent, from 7 to 14 a rebuttable presumption exists they may be guilty thereof, and over 14, absent special circumstances, they are chargeable with exercising the standard of care of an adult."

*Bailey v. Martz,* 488 N.E.2d 716, 721 (Ind.Ct. App.1986) (citing *Smith v. Diamond,* 421 N.E.2d 1172, 1177–79 (Ind.Ct.App.1981)), *trans. denied.*[1] In the middle age category, the standard of care is in accord with the Restatement: whether the child exercised the care under the circumstances of a child of like age, knowledge, judgment and experience. *Id.* This court long ago recognized "the wisdom of the rule which holds a child to the exercise of care proportionate to its capacity." *Baltimore & Ohio Southwestern R.R. Co. v. Hickman,* 40 Ind.App. 315, 318, 81 N.E. 1086, 1087 (1907).

Unlike the Restatement, which treats children differently than adults in terms of the standard of care required of each, Indiana has indicated a willingness to factor in an adult's mental capacity when determining whether to hold such a person responsible for negligence. In *Riesbeck Drug Co. v. Wray,* 111 Ind.App. 467, 39 N.E.2d 776 (1942), this court was presented with an appeal from an action against a pharmacy in connection with the death of the plaintiff's husband. The deceased, who was ill, unemployed, and suffering from depression, sent his eight-year-old son to the local pharmacy to obtain carbolic acid. The pharmacy distributed the acid to the child who brought it home to his father. The father then took his own life by ingesting the acid. This court stated that evidence of the deceased's mental condition at the time he sent his son to obtain the acid was material on the question of contributory negligence and declared:

"Although in the case of adults it has been deemed impracticable and unwise to determine contributory negligence on the basis of whether the party was mentally acute or inclined to be dull or slow-witted, although not mentally deficient, a person who is so absolutely devoid of intelligence as to be unable to apprehend apparent danger and to avoid exposure to it cannot be said to be guilty of negligence. Knowledge and appreciation of peril are essential elements of contributory negligence, and evidence is admissible to show a plaintiff's mental condition to aid the jury in determining whether he understood and appreciated the danger. 38 Am.Jur., Negligence, Sec. 201 p. 882."

*Id.* at 475, 39 N.E.2d at 779.

This court subsequently limited the application of the foregoing principles in *Kroger Co. v. Haun,* 177 Ind.App. 403, 379 N.E.2d 1004 (1978). One of the questions decided in *Kroger* was whether the doctrine of contributory negligence required the plaintiff's actual knowledge of the peril or whether constructive knowledge would suffice. This court first noted that the *Wray* court's reliance on the American Jurisprudence authority "reveals that the cited section deals with the existence of extenuating circumstances—age, illiteracy, mental incompetency—which call for special consideration in applying the standard 'reasonable man' test." *Id.* at 411, 379 N.E.2d at 1009–10. The *Kroger* court acknowledged the import of the existence of such extenuating circumstances when it ultimately held that: "We believe the actual state of the law to be, absent extenuating circumstances such as age or mental incompetency, that contributory negligence may be found either where plaintiff has actual knowledge of the danger, or, in the exercise of reasonable care, should have appreciated or anticipated the danger." *Id.* at 413, 379 N.E.2d at 1010–11.[2]

---

1. The United States District Court for the Northern District of Indiana has recently criticized the *Bailey* case on the ground that it mischaracterizes the presumption regarding children between the ages of seven and fourteen and because it incorrectly cited the *Smith* case. *Maynard v. Indiana Harbor Belt R.R. Co.,* 997 F.Supp. 1128 (N.D.Ind.1998). Nonetheless, the court held that with or without a presumption, a thirteen-year-

old child's ability to recognize danger and exercise care for his safety were questions of fact given the conflicting evidence presented by the parties in summary judgment proceedings. *Id.* at 1136–37.

2. *Bailey, Wray* and *Kroger* all involved principles of contributory negligence. Such principles have been subsumed in Indiana's comparative

Based upon this precedent, we hold that a person's mental capacity, whether that person is a child or an adult, must be factored in to the determination of whether a legal duty exists. The determination of whether such a duty exists is most frequently accomplished by balancing the three factors set forth in *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind.1991): 1) the relationship between the parties; 2) the reasonable foreseeability of harm to the person injured; and, 3) public policy concerns.[3] Although the existence of a duty arising from the balancing of these factors is generally a question of law for the court to decide, genuine issues of material fact may be interwoven with the relationship and foreseeability factors, making the existence of a duty a mixed question of law and fact, ultimately to be decided by the finder of fact. *State v. Cornelius*, 637 N.E.2d 195, 198 (Ind.Ct.App.1994), *trans. denied.*

### A. Relationship Between the Parties

In determining whether a relationship exists between two parties upon which a legal duty may be based, there must be some knowledge on the part of the purported tortfeasor that his or her conduct may draw him or her into a legal relationship with another. *T.S.B. by Dant v. Clinard*, 553 N.E.2d 1253, 1256 (Ind.Ct.App.1990) (party being charged with negligence must have knowledge of situation or circumstances surrounding relationship). In the absence of extenuating circumstances, the relationship between a patient in a health care facility and the caregivers working in the facility is sufficient upon which to base a legal duty.

Extenuating circumstances that alter the relationship include the patient's mental capacity. The patient-caregiver relationship will vary according to the nature and extent of the patient's mental capacity to control his actions and understand the consequences thereof. The greater the degree of the patient's impairment, the less weight to be given to the relationship factor in determining legal duty.

### B. Foreseeability of Harm

The foreseeability factor is analyzed by considering "the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence." *Goldsberry v. Grubbs*, 672 N.E.2d 475, 479 (Ind.Ct.App. 1996). The type of plaintiff involved here is a caregiver of patients with Alzheimer's disease. As the trial court found, Alzheimer's patients often exhibit signs of violence and combativeness. *Record* at 255. It is foreseeable that when an Alzheimer's patient becomes combative in the presence of his caregiver, the caregiver will be injured. Thus, the foreseeability factor weighs in favor of imposing a duty.

### C. Public Policy Concerns

The public policy concerns involved with imposing a duty on an institutionalized mentally disabled patient are the cause of passionate debate. The Wisconsin Supreme Court has stated the public policy concerns as:

> "where a loss must be borne by one of two innocent persons, it shall be borne by him who occasioned it, and it has also been held that public policy requires the enforcement

fault scheme. Nonetheless, principles of contributory negligence have been applied in cases involving the determination of negligence and the determination of comparative fault. *See, e.g., Walters v. Dean*, 497 N.E.2d 247, 254 (Ind.Ct. App.1986); *Kroger*, 177 Ind.App. at 413, 379 N.E.2d at 1010.

3. The supreme court has recently stated that the *Webb* balancing test "provides an extremely useful method of analysis, but not necessarily the exclusive test, for determining the existence of [a] duty under Indiana law." *Cram v. Howell*, 680 N.E.2d 1096, 1097 n. 1 (Ind.1997) (holding for purposes of Indiana Trial Rule 12(B)(6) motion, physician owed duty to third persons to take

reasonable precautions in monitoring, releasing, and warning his patient whom physician had given immunizations and/or vaccinations which caused patient to lose consciousness while driving). *See also Perdue Farms, Inc. v. Pryor*, 683 N.E.2d 239, 241 (Ind.1997) (stating that determination of legal duty may consider three factors set forth in *Webb* in addition to "various other factors."). Thus, a different analytical framework could be utilized in which mental capacity is a fourth factor to be considered where infirmity of the tortfeasor is at issue. Our result under such an analysis would be the same as that which we reach using the *Webb v. Jarvis* methodology.

of the liability in order that those interested in the estate of the insane person, as relatives or otherwise, may be under inducement to restrain him and that tortfeasors may not simulate or pretend insanity to defend their wrongful acts causing damage to others."

*Gould v. American Family Mut. Ins. Co.,* 198 Wis.2d 450, 543 N.W.2d 282, 285 (1996) (quoting *In re Meyer's Guardianship,* 218 Wis. 381, 261 N.W. 211, 213 (1935)). These public policy considerations prompted Wisconsin to subscribe to the general rule that mentally disabled adults are held responsible for their torts without regard to their mental capacity. *See Gould,* 543 N.W.2d at 284–85 (noting general rule adopted in *Meyer*). On the theory that none of these public policy considerations are present with an institutionalized mentally disabled patient who cannot control or appreciate his or her conduct, the Wisconsin Supreme Court created a narrow exception to the general rule to provide "that a person institutionalized . . . with a mental disability, and who does not have the capacity to control or appreciate his or her conduct cannot be liable for injuries caused to caretakers who are employed for financial compensation." *Id.,* 543 N.W.2d at 287. *See also Burch v. American Family Mut. Ins. Co.,* 198 Wis.2d 465, 543 N.W.2d 277, 280 (1996) (recognizing that *Gould* decision "carves out a very narrow exception for institutionalized mentally disabled persons who are unable to control or appreciate the consequences of their conduct when they injure caretakers who are employed for financial compensation."). The court's justification for creating this exception was that the circumstances of the case "totally negate the rationale behind the rule and would place an unreasonable burden on the negligent institutionalized mentally disabled." *Gould,* 543 N.W.2d at 287. The court explained:

"When a mentally disabled person injures an employed caretaker, the injured party can reasonably foresee the danger and is not 'innocent' of the risk involved. By placing a mentally disabled person in an institution or similar restrictive setting, 'those interested in the estate' of that person are not likely to be in need of an inducement for greater restraint. It is

incredible to assert that a tortfeasor would 'simulate or pretend insanity' over a prolonged period of time and even be institutionalized in order to avoid being held liable for damages for some future civil act."

*Id.* (quoting *Meyer*). The court recognized that other courts "have rejected the common law rule within the limited context of severely mentally disabled persons confined in institutions based on similar public policy considerations." *Id.* n. 7 (citing *Mujica v. Turner,* 582 So.2d 24, 25 (Fla.Dist.Ct.App. 1991); *Anicet v. Gant,* 580 So.2d 273 (Fla. Dist.Ct.App.1991)).

In addition to the considerations identified in Wisconsin and Florida, other public policy concerns weigh both in favor of and against imposing a duty on an institutionalized mentally disabled person. On the one hand, imposing a duty on institutionalized mentally disabled patients will encourage individuals to seek and accept positions as caregivers because they know their injuries will not go uncompensated. Imposing a duty on institutionalized mentally disabled patients may also make equal application of the law difficult because of the inherent challenges of distinguishing between those individuals who suffer a mental incapacity of such a degree that a legal duty should not be imposed and those individuals who suffer from a less severe emotional imbalance upon whom a duty should be imposed. On the other hand, public policy is not served by imposing a duty on institutionalized mentally disabled patients who are unable to control their actions or know the consequences thereof and also are unable to obtain liability coverage to insure against the risk of negligence. In addition, there is no rational justification for distinguishing between children who are unable to appreciate danger and upon whom we impose no duty because of incapacity resulting from age, knowledge, judgment, and experience and adults who are unable to appreciate danger because of incapacity resulting from Alzheimer's or other dementia.

■ Like the relationship factor, we conclude that the public policy implications of imposing a duty on an institutionalized mentally disabled patient are dependent upon the

degree of the patient's incapacity. The greater the patient's degree of impairment, the more the public policy concerns weigh against imposing a duty on him for the reasons set forth in *Gould.*

### D. Application of Factors to Present Case

■ Turning to the Record before us, we hold that genuine issues of material fact exist concerning the degree of Rusk's impairment and, accordingly, the existence of a legal duty. The designated materials establish that Rusk suffered some impairment of his mental capacity. Rusk was admitted to BHC because he suffered from memory loss and confusion. He had been a patient at BHC for nearly three years when the incident with Creasy occurred. Rusk's history at BHC demonstrated anxiousness, disorientation, combativeness, aggressiveness, and belligerence.

The Record, however, does not establish the degree of Rusk's impairment or its effect on his ability to control his actions or understand the consequences thereof. In this regard, the trial court determined that there was no genuine issue of material fact presented that "[a]s an Alzheimer's patient in an advanced stage of the disease, Mr. Rusk was unable to appreciate the consequences of his acts or control his behavior." *Record* at 255. Our review of the Record reveals that the only basis for this determination is the affidavit of Sharon Ayres which Rusk designated in support of his motion for summary judgment. Ayres is a Licensed Practical Nurse. There is nothing in her affidavit setting forth her qualifications to render an expert opinion as to Rusk's medical condition. Without such qualifications, her opinion does not constitute an expert one on the status of Rusk's mental capacity.[4] *See* Ind.Evidence Rule 702(a) (witness·must be qualified as an expert "by knowledge, skill, experience, training, or education[.]"). Absent an opinion by a person qualified as an expert, the extent of Rusk's dementia resulting from Alzheimer's

and its effect on his ability to control his actions or understand the consequences thereof are genuine issues of material fact precluding summary judgment.

Because genuine issues of material fact exist regarding the degree of Rusk's mental capacity to control or appreciate his conduct, summary judgment was inappropriately entered on the question of whether Rusk owed Creasy a legal duty of care.

### II. Incurred Risk

■ The trial court also found that Rusk was entitled to summary judgment because Creasy incurred the risk of her injuries. Incurred risk no longer exists as an absolute defense to a negligence claim in light of Indiana's adoption of comparative fault. *Heck v. Robey,* 659˙N.E.2d 498, 505 (Ind. 1995). "[A] plaintiff's risk-taking is a consideration embodied in Indiana's Comparative Fault Act and must be assessed thereunder." *Johnson v. Steffen,* 685 N.E.2d 1117, 1119 (Ind.Ct.App.1997) (discussing *Heck*), *trans. denied* (1998).[5] Accordingly, we will analyze any risk-taking by Creasy in the following discussion of fault allocation. We simply state here that Rusk was not entitled to judgment as a matter of law on the theory of incurred risk.

### III. Fault Allocation

■ The trial court further found that Rusk was entitled to summary judgment because Creasy's comparative fault exceeded all other fault proximately contributing to her injuries. Generally, fault allocation under Indiana's Comparative Fault Act is a question for the trier of fact. *Walters v. Dean,* 497 N.E.2d 247, 254 (Ind.Ct.App.1986). Fault allocation may be decided as a matter of law only if the evidence is undisputed and the fact finder could reach only one conclusion. *Id.* To allocate fault to a plaintiff as a matter of law on a theory of incurred risk, the undisputed evidence must conclusively show that plaintiff knew and appreciated the

---

4. Although we decide the sufficiency of Ayres' affidavit solely on the basis of its contents, we also note that the definition of practical nursing does not include the rendering of medical diagnoses. *See* IC 25–23–1–1.3.

5. IC 34–4–33–2(a)(1) defines fault to include incurred risk.

danger caused by a defendant's negligence, but nevertheless voluntarily accepted it. *Lilge v. Russell's Trailer Repair, Inc.*, 565 N.E.2d 1146, 1150–51 (Ind.Ct.App.1991). The plaintiff must have had more than a general awareness of a potential for mishap; she must have had actual knowledge of the specific risk. *Id.* at 1151. Under the Comparative Fault Act, Creasy would be precluded from recovering from Rusk if the amount of fault attributed to her was greater than the fault attributed to Rusk. *See* IC 34–4–33–4(a).

■ Here, Creasy was familiar with caring for Alzheimer's patients, including Rusk. She was aware that Rusk suffered from Alzheimer's and knew that he was very agitated and combative on the evening that she was injured. We cannot say as a matter of law, however, that these undisputed facts lead only to the conclusion that Creasy's fault was greater than Rusk's. Such a determination is best left to the finder of fact. Rusk was not entitled to judgment as a matter of law on the basis that Creasy's fault was comparatively greater than Rusk's.

### IV. Breach

■ The trial court finally found that Rusk was entitled to summary judgment because Creasy did not bring forth evidence that Rusk breached any duty owed to her. Creasy was not required to do so. Under Indiana's summary judgment standard, "the party seeking summary judgment must demonstrate the absence of any genuine issue of fact as to a determinative issue, and only then is the non-movant required to come forward with contrary evidence." *Goldsberry*, 672 N.E.2d at 481 (quoting *Jarboe v. Landmark Community Newspapers*, 644 N.E.2d 118, 123 (Ind.1994)). The Record here does not show that Rusk, as the party seeking summary judgment, demonstrated the absence of any genuine issue of fact on the issue of breach. Absent such demonstration, Creasy was not required to come forth with any evidence to establish breach. Rusk was not entitled to judgment as a matter of law on the breach element of Creasy's claim.

Reversed.

SULLIVAN, J., concurs with separate opinion.

FRIEDLANDER, J., dissents with separate opinion.

SULLIVAN, Judge, concurring.

I concur subject to a *caveat* with respect to the majority and dissenting opinions' analysis of "duty".

Justice Dickson, speaking for the court in *Gariup Construction Co., Inc. v. Foster* (1988) Ind., 519 N.E.2d 1224, 1227, noted that the duty determination is made "not without difficulty", and, in quoting from a well-regarded treatise, concluded that " '[n]o better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.' " *See* Jay Tidmarsh, *Tort Law: The Languages of Duty,* 25 Ind. L.Rev. 1419 (1992).

It is for this reason, perhaps, that we have in the past articulated the principle that:

> "The Law imposes but one common law duty and that duty is to use due care (citation omitted). The duty is the same for all relations, without regard to the facts of the case." *South Eastern Indiana Natural Gas Co., Inc. v. Ingram* (1993) 1st Dist. Ind.App., 617 N.E.2d 943, 953.

As a corollary to this premise we have said:

> "[T]he substantive law establishes the standard of care which must be met, i.e., reasonable care. The standard is a fixed one and is independent of the conduct of others but the conduct required of the individual to measure up to the fixed standard varies depending upon the nature of the duty owed and the surrounding circumstances." *Walters v. Kellam & Foley* (1977) 2d Dist., 172 Ind.App. 207, 360 N.E.2d 199, 214.

In short, the duty is that of reasonable care under the circumstances. That duty never changes. It always exists although the circumstances may differ from case to case. While the duty remains the same, the conduct required to meet that standard may be affected by the actor's mental capacity. It is

for this reason that I agree that summary judgment was inappropriate and that the matter should be submitted to the trier of fact for determination.[6]

FRIEDLANDER, Judge, dissenting.

I believe that the trial court was correct in granting summary judgment in favor of Rusk and therefore respectfully dissent from the majority's holding to the contrary.

As the majority indicates, we are confronted in this case with a question of first impression in Indiana. The issues decided herein take on heightened practical and social importance because, unfortunately, Alzheimer's disease is not rare. One study shows a prevalence of Alzheimer's disease of 3% in the 65 to 74 age group, increasing to 18.7% in the 75 to 84 range, and as high as 47% in the 85 and over range. Evans, D. et al, *Prevalence of Alzheimer's Disease in a Community Population of Older Persons,* 262 Journal of the American Medical Assoc. 2551 (1989). It can be inferred that as the average age of Americans increases, so will the incidence of Alzheimer's disease. Office of Technology Assessment, *Losing a Million Minds: Confronting the Tragedy of Alzheimer's Disease and other Dementias* (Pub. No. OTA–BA324). Many of those who develop the disease will require institutionalization. *See id.* at 76–27 (while some retain their normal personality traits as the disease progresses, "others exhibit drastic changes that can create serious, complex management problems for caregivers and physicians, in-

creasing the chances that the patient will be institutionalized").

We are asked to decide whether a person institutionalized with advanced Alzheimer's is liable in tort if he strikes out and injures a caretaker employed by the institution. I readily acknowledge that in some cases such as this, summary judgment may be inappropriate because a material question of fact exists concerning whether the defendant's Alzheimer's disease has advanced to a stage where the patient-defendant has no capacity to appreciate or control his violent behavior. I do not believe, however, that this is such a case.

Rusk was initially admitted to the Brethren Healthcare Center (BHC) because his Alzheimer's condition rendered him confused and suffering from memory loss to such an extent that his wife could no longer care for him. By May 1995, when Creasy sustained her injuries, Rusk had been a resident at BHC for more than three years. During that time, the Alzheimer's disease continued to progress. By the time of the occurrence, his condition was marked by aggressiveness, belligerence, and violent behavior directed at others. All of these behaviors are characteristic of a person in the advanced stage of Alzheimer's.[7]

Sharon Ayres was a licensed practical nurse employed at BHC. At the time of the occurrence, Ayres had worked at BHC for approximately nine years. Ayres submitted an affidavit stating that Rusk was in the advanced stage of Alzheimer's and was there-

---

6. As an aside, I would also note that the trial court used the term "incurred risk" to describe the doctrine warranting summary judgment and the respective parties use the same term in their arguments. It is not uncommon for the terms "incurred risk" and "assumed risk" to be used interchangeably in reported decisions. There is little, if any, practical difference in the application of the principle contained within the doctrines. However, the term "assumed risk" is the appropriate term to describe the defense relating to a claim made by one who is exposed to a risk arising within a contractual relationship. *City of Alexandria v. Allen* (1990) Ind.App., 552 N.E.2d 488.

7. Alzheimer's is a progressive illness that has been divided into stages according to the progression of the characteristic clinical and behav-

ioral changes that are displayed. Generally, there are four recognized stages of Alzheimer's—early, middle, advanced, and terminal—which are marked by worsening levels of disorientation, memory failure, intellectual deterioration, and personality change. Neurological impairment becomes apparent in the advanced and terminal stages of the illness. In the advanced stage, symptoms include: (1) dependence on others for the requirements of daily life (such as food, shelter, and protection); (2) verbal responses have little correlation to what is asked; and (3) inability to communicate needs other than by resort to caustic behavior such as yelling, noisiness, and striking out; such behavior is also likely to occur without any relationship to needs. Lee R. Russ, Bruce F. Freeman, & J. Stanley McQuade, *Attorneys Medical Advisor* § 76.12 (1994).

fore unable to appreciate the consequences of his actions. The majority rejects Ayres's statement on the ground that there is nothing in her affidavit qualifying her as an expert witness to offer such testimony. I disagree with this conclusion.

Ind. Evidence Rule 702 provides that a witness may be qualified as an expert by virtue of "knowledge, skill, experience, training, or education." Any one characteristic alone may qualify an individual as an expert. *Fleener v. State*, 648 N.E.2d 652 (Ind.Ct.App. 1995), *vacated in part on other grounds, aff'd. on all other grounds*, 656 N.E.2d 1140 (Ind.1995). Therefore, a person may qualify as an expert on the basis of practical experience alone. *Fowler v. Napier*, 663 N.E.2d 1197 (Ind.Ct.App.1996). The question of whether a person qualifies as an expert rests within the sound discretion of the trial court. *Id.*

Ayres's affidavit states that she is a licensed practical nurse, signifying that she had at least the medical training necessary to obtain that license. More importantly, the affidavit states that Ayres had worked at BHC for nine years at the time Creasy was injured. In my view, the practical experience gained through working with Alzheimer's patients on a regular basis for nine years, and specifically through working with Rusk on occasion for three years, qualified Ayres as an expert for the purpose of rendering an opinion regarding whether Rusk was in the advanced stage of Alzheimer's and whether he was able to appreciate the consequences of his actions.

It is also significant to me that the degree of Rusk's disability was never placed at issue by Creasy. Rusk sought summary judgment on the basis that Alzheimer's disease rendered him incapable of appreciating the consequences of his actions. Ayres's supporting affidavit both asserted and tended to prove that Rusk was in the advanced stage of Alzheimer's and was unable to appreciate the consequences of his action. In response to Rusk's motion, Creasy designated six genuine issues of material fact that precluded summary judgment, including:

(1) Whether the defendant committed a wrong in kicking, twisting, and pulling Ms. Creasy's left leg and back;

(2) Whether the defendant is relieved of responsibility for his actions because of a mental deficiency that he might have;

(3) The defendant's percentage of fault for causing the injuries sustained by the plaintiff;

(4) Whether plaintiff incurred the risk of defendant's wrongful conduct, and, if so, her percentage of fault for incurring the risk;

(5) Whether plaintiff committed any contributory negligence and, if so, her percentage of fault for her contributory negligence; and

(6) The total amount of damages the plaintiff would be entitled to recover if fault were disregarded.

*Record* at 188 (Creasy's Designation of Genuine Issues of Material Fact That Preclude Entry of Summary Judgment on Defendant's Motion). In my view, the designation of issues reflects that Creasy did not challenge the assertion regarding the advanced nature of Rusk's condition, and does not do so now upon appeal. Rather, Creasy's arguments both in opposing the summary judgment motion and in appealing the ruling thereon assumed as true the assertion that Rusk's condition rendered him incapable of understanding the consequences of his actions.

At the trial court level, the parties focused their arguments upon this question and the trial court rendered summary judgment upon this basis. Again upon appeal, the parties have concentrated their argument upon the question of whether a person with advanced Alzheimer's can be liable in tort to his paid caretakers. All the while, the parties have treated the question of whether Rusk's Alzheimer's rendered him incapable of appreciating the consequences of his actions as if it were not an issue-they have assumed that it did. I believe the majority errs by characterizing as a question of fact a matter that the parties have regarded as settled. Therefore, my analysis proceeds upon the assumption that Rusk's Alzheimer's rendered him

incapable of appreciating the consequences of his actions.

What is left for us to decide, in my view, is a pure question of law: Is a person in the advanced stage of Alzheimer's liable in tort for his actions that injure his paid caretakers in a special care facility? As the majority indicates, several jurisdictions have recently addressed precisely the same issue. In each of those recent cases, the court concluded that the patient was not liable because, among other things, the patient did not owe the caregiver a duty to refrain from the injury-inflicting conduct. *See Colman v. Notre Dame Convalescent Home, Inc.*, 968 F.Supp. 809 (D.Conn.1997) (predicting Connecticut law); *Herrle v. Estate of Marshall*, 45 Cal.App.4th 1761, 53 Cal.Rptr.2d 713 (1996); *Mujica v. Turner*, 582 So.2d 24 (Fla. Dist.Ct.App.1991), *review denied; Anicet v. Gant*, 580 So.2d 273 (Fla.Dist.Ct.App.1991), *review denied; Gould v. American Family Mut. Ins. Co.*, 198 Wis.2d 450, 543 N.W.2d 282 (1996); *but see McGuire v. Almy*, 297 Mass. 323, 8 N.E.2d 760 (1937) (imposing liability on insane person for intentional torts); *Van Vooren v. Cook*, 273 App.Div. 88, 75 N.Y.S.2d 362, 365 (1947) (imposing civil liability on one "suffering from a defective reasoning" for assault and battery). I agree with the basic reasoning in those cases, except for certain aspects of those opinions that will be explained more fully below, and would hold that Rusk was entitled to summary judgment for lack of duty.

As Creasy points out in her appellate brief, it is widely accepted in most American jurisdictions that mentally disabled adults are held to an objective reasonable person standard and are thereby deemed responsible for the torts they commit regardless of their capacity to comprehend their actions. *See Gould v. American Family Mut. Ins. Co.*, 198 Wis.2d 450, 543 N.W.2d 282. Based upon *In re Meyer's Guardianship*, 218 Wis. 381, 385, 261 N.W. 211, 213 (1935), the *Gould* court referred to this as "the *Meyer* rule". The *Gould* court acknowledged the general rule of liability, that the defendant in that case had been negligent, and that said negligence was a cause of the plaintiff's injuries. The court concluded, however, that public

policy considerations in such cases may sometimes preclude liability. The public policy concerns identified in *Gould* include: (1) providing recourse to innocent third parties harmed by the disabled person's acts; (2) providing incentive for those responsible for a mentally disabled person to shield others from harm that may be caused by the disability; and (3) obviating the possibility of faking a mental disability to escape civil liability. In my view, the same concerns counsel against imposing liability in the instant case.

Creasy cannot fairly be regarded as an "innocent" member of the public, as that term is used in this context. Creasy had express knowledge of the dangers inherent in dealing with Alzheimer's patients in general and with Rusk in particular. In fact, Creasy was aware before she attended Rusk and was injured that he had been "very agitated and combative that evening", *Record* at 228, and that he was hitting and kicking wildly immediately before the incident. Holding Rusk accountable in negligence under those circumstances "places too great a burden on him because his disorientation and potential for violence is the very reason he was institutionalized and needed the aid of employed caretakers." *Gould*, 543 N.W.2d at 287.

The second rationale upon which the *Meyer* rule is premised is that it provides incentive for those responsible for a mentally disabled person to restrain him. In the instant case, Rusk's family placed him in a long-term care facility which was equipped, staffed, and intended to care for, among others, Alzheimer's patients, including those exhibiting violent behavior. In so doing, they did everything they could do to restrain Rusk and I cannot conceive of further, humane restraint that they could have sought. In this circumstance, incentive to do more obviously is not a valid consideration.

The final reason for the *Meyer* rule is to prevent persons from simulating insanity in order to defend against civil liability for their torts. As the *Gould* court stated about the mentally disabled civil defendant in that case, "[t]o suggest that [the defendant] would 'simulate or pretend' the symptoms of Alzheimer's disease over a period of years in order to

avoid future tort liability is incredible." *Gould*, 543 N.W.2d at 287.

I do not disagree with the majority's conclusion that public policy concerns require a consideration of the degree of the patient's impairment when deciding the question of duty. The majority's opinion, however, creates a sliding scale ("[t]he greater the patient's degree of impairment, the more the public policy concerns weigh against imposing a duty on him for the reasons set forth in *Gould*", Op. at 448) that arguably renders summary judgment practically unavailable because it assigns the determination of the degree of mental impairment exclusively to the factfinder. While I agree with the general rule that mentally disabled persons are ordinarily responsible for their torts, it should not apply where "circumstances totally negate the rationale behind the rule." *Gould*, 543 N.W.2d at 287. In my view, an institutionalized Alzheimer's patient injuring a compensated, trained caretaker is one set of circumstances that negates liability and is appropriate for summary disposition.

Finally, I reject Creasy's argument that *Gould*, along with *Herrle, Anicet,* and *Mujica,* are not persuasive in Indiana because they contravene principles announced by our supreme court in *Heck v. Robey,* 659 N.E.2d 498 (Ind.1995). Creasy contends that the *Gould* court relied on the doctrine of primary assumption of the risk and an expansion of the fireman's rule. My view is not dependent upon the portions of *Gould* that refer to those doctrines. In fact, I do not consider primary assumption of the risk or the fireman's rule to the extent those principles consider the conduct of the plaintiff which bars reliance upon an otherwise existing tort. Rather, as did the court in *Anicet v. Gant,* 580 So.2d at 277, I "conclude that no *duty* to refrain from violent conduct arises on the part of a person who has no capacity to control it to one who is specifically employed to do just that." (Emphasis in original.)

In summary, I would hold that, as a matter of sound public policy, a person institutionalized because of Alzheimer's who does not have the capacity to control or appreciate his or her conduct cannot be liable for injuries caused to persons who are employed by that institution to care for Alzheimer's patients.