**Carol CREASY, Appellant (Plaintiff below),**

v.

**Lloyd RUSK, Appellee (Defendant below).**

No. 08S02–9901–CV–74.

Supreme Court of Indiana.

June 14, 2000.

Ronald S. Todd, Edgar W. Bayliff, Bayliff, Harrigan, Cord & Maugans, P.C., Kokomo, Indiana, Attorneys for Appellant.

Stephen C. Wheeler, Renae L. Hermann, Jennings, Taylor, Wheeler & Bouwkamp, P.C., Carmel, Indiana, Attorneys for Appellee.

**ON PETITION TO TRANSFER**

SULLIVAN, Justice.

Carol Creasy, a certified nursing assistant, sued Lloyd Rusk, an Alzheimer's patient, for injuries she suffered when he

kicked her while she was trying to put him to bed. We hold that adults with mental disabilities have the same general duty of care toward others as those without. But we conclude that the relationship between the parties and public policy considerations here are such that Rusk had no such duty to Creasy.

### Background

In July, 1992, Lloyd Rusk's wife admitted Rusk to the Brethren Healthcare Center ("BHC") because he suffered from memory loss and confusion and Rusk's wife was unable to care for him. Rusk's primary diagnosis was Alzheimer's disease. Over the course of three years at BHC, Rusk experienced periods of anxiousness, confusion, depression, disorientation, and agitation. Rusk often resisted when staff members attempted to remove him from prohibited areas of the facility. On several occasions, Rusk was belligerent with both staff and other residents. In particular, Rusk was often combative, agitated, and aggressive and would hit staff members when they tried to care for him.

BHC had employed Creasy as a certified nursing assistant for nearly 20 months when the incident at issue occurred. Creasy's responsibilities included caring for Rusk and other patients with Alzheimer's disease. Creasy did not have specialized training on how to care for people with Alzheimer's disease, but she did attend a short BHC presentation on the pathological effects of Alzheimer's. Residents with Alzheimer's had bruised Creasy during the course of her work for BHC, and Creasy knew that Rusk had Alzheimer's disease.

On May 16, 1995, Creasy and another certified nursing assistant, Linda Davis, were working through their routine of putting Rusk and other residents to bed. Creasy knew that Rusk had been "very agitated and combative that evening." (R. at 228.) By Creasy's account:

[Davis] was helping me put Mr. Rusk to bed. She was holding his wrists to keep him from hitting us and I was trying to get his legs to put him to bed. He was hitting and kicking wildly. During this time, he kicked me several times in my left knee and hip area. My lower back popped and I yelled out with pain from my lower back and left knee.

(*Id.*)

Creasy filed a civil negligence suit against Rusk, seeking monetary damages for the injuries she suffered as a result of Rusk's conduct. Rusk moved for summary judgment and the trial court granted his motion. Creasy appealed. The Court of Appeals reversed, holding "that a person's mental capacity, whether that person is a child or an adult, must be factored [into] the determination of whether a legal duty exists," *Creasy v. Rusk*, 696 N.E.2d 442, 446 (Ind.Ct.App.1998), and that a genuine issue of material fact existed as to the level of Rusk's mental capacity, *see id.* at 448.

### Discussion

This case requires us to decide two distinct questions of Indiana common law:

(1) Whether the general duty of care imposed upon adults with mental disabilities is the same as that for adults without mental disabilities?

(2) Whether the circumstances of Rusk's case are such that the general duty of care imposed upon adults with mental disabilities should be imposed upon him?

I

A

In many, if not most, jurisdictions, the general duty of care imposed on adults with mental disabilities is the same as that for adults without mental disabilities. *See* Restatement (Second) of Torts § 283B (1965).[1] Adults with mental disabilities

---

1. *See also* Restatement (Third) of Torts § 9(c)

(Discussion Draft Apr. 5, 1999); *Johnson v.*

are held to the same standard of care as that of a reasonable person under the same circumstances without regard to the alleged tortfeasor's capacity to control or understand the consequences of his or her actions. *See id.* We will discuss the Restatement rule in greater detail in Part I–C.

## B

Judge Kirsch, writing for the Court of Appeals in this case, found that Indiana law does not follow the Restatement rule. The Court of Appeals held "that a person's mental capacity, whether that person is a child or an adult, must be factored [into] the determination of whether a legal duty exists." *Creasy v. Rusk,* 696 N.E.2d 442, 446 (Ind.Ct.App.1998).[2] We believe that the Court of Appeals accurately stated Indiana law but that the law is in need of revision.

With respect to children, Indiana has incorporated the essence of the Restatement standard for determining the liability of children for their alleged tortious acts. The Restatement standard of conduct for a

*Lambotte,* 147 Colo. 203, 363 P.2d 165 (1961) (holding that a person with mental disabilities will be charged with his or her own negligence unless he or she is incapable of exercising reasonable care); *Anicet v. Gant,* 580 So.2d 273 (Fla.Dist.Ct.App.1991) (affirming that, as a rule, an adult with mental disabilities is liable in the same generalized way as an adult without mental disabilities for both intentional and negligent acts), *review denied;* *Williams v. Kearbey,* 13 Kan.App.2d 564, 775 P.2d 670 (1989) (holding that an insane person who shoots another is civilly liable for damages to those injured and that a finding of insanity does not preclude a finding that a defendant had the requisite intent to commit the tort); *Swift v. Fitchburg Mut. Ins. Co.,* 45 Mass.App.Ct. 617, 700 N.E.2d 288 (1998) (affirming that, as a general rule, people with mental disabilities are liable for their torts and are held to a standard of a reasonable person in the circumstances), *review denied;* *Stuyvesant Assocs. v. Doe,* 221 N.J.Super. 340, 534 A.2d 448 (1987) (holding that insanity or mental deficiency on the part of an adult does not relieve him or her from liability for gross negligence); *Kuhn v. Zabotsky,* 9 Ohio St.2d 129, 224 N.E.2d 137 (1967) (stating that the rule is well established that a person with

child is "that of a reasonable person of like age, intelligence, and experience under like circumstances." Restatement (Second) of Torts § 283A (1965) (hereinafter, "Restatement rule"). Indiana reformulates the Restatement rule into a three-tiered analysis:

[C]hildren under the age of 7 years are conclusively presumed to be incapable of being contributorily negligent, from 7 to 14 a rebuttable presumption exists they may be guilty thereof, and over 14, absent special circumstances, they are chargeable with exercising the standard of care of an adult.

*Bailey v. Martz,* 488 N.E.2d 716, 721 (Ind. Ct.App.1986) (citing *Smith v. Diamond,* 421 N.E.2d 1172, 1177–79 (Ind.Ct.App. 1981)), *transfer denied.*[3] In the age seven to fourteen category, Indiana applies the Restatement standard and ascertains whether the child exercised the care under the circumstances of a child of like age, knowledge, judgment, and experience. *See id.*

mental illness may be held liable for his or her negligence); *Gould v. American Family Mut. Ins.,* 198 Wis.2d 450, 543 N.W.2d 282 (1996) (holding that people with mental disabilities can be found liable for negligence and must be held to same standard of care as those without disabilities).

2. The Court of Appeals also held that a genuine issue of material fact existed as to the level of Rusk's mental capacity. *See Creasy,* 696 N.E.2d at 448.

3. As the Court of Appeals noted in *Creasy,* the United States District Court for the Northern District of Indiana has criticized *Bailey* on the ground that it incorrectly cited *Smith* and in doing so mischaracterized the presumption regarding children between the ages of seven and fourteen. *See Maynard v. Indiana Harbor Belt R.R. Co.,* 997 F.Supp. 1128, 1134–35 (N.D.Ind.1998). Nevertheless, the *Maynard* court concluded that, in that case, a thirteen-year-old boy's ability to recognize danger and to exercise care for his own safety were questions of fact given the conflicting evidence presented by the parties in summary judgment proceedings. *See id.* at 1136–37.

· Consistent with recognizing a rule that holds a child to a standard of care proportionate to his or her capacity, *see Baltimore & Ohio Southwestern R.R. Co. v. Hickman*, 40 Ind.App. 315, 318, 81 N.E. 1086, 1087 (1907), Judge Kirsch observed that Indiana has also indicated a willingness to consider the mental capacity of an adult with mental disabilities when determining negligence liability, *Creasy*, 696 N.E.2d at 445. *See generally Kroger Co. v. Haun*, 177 Ind.App. 403, 413, 379 N.E.2d 1004, 1010–11 (1978) ("[A]bsent extenuating circumstances such as age or mental incompetency, ... contributory negligence may be found either where plaintiff has actual knowledge of the danger, or, in the exercise of reasonable care, should have appreciated the danger."); *Hunsberger v. Wyman*, 247 Ind. 369, 373, 216 N.E.2d 345, 348 (1966) ("In order for an act or an omission to constitute negligence, a person to be charged must have knowledge or notice that such an act or omission involved danger to another.... Where there is no knowledge, actual or constructive, of danger or peril on the part of a defendant, he cannot be charged with negligence."); *Riesbeck Drug Co. v. Wray*, 111 Ind.App. 467, 475, 39 N.E.2d 776, 779 (1942) ("Knowledge and appreciation of peril are essential elements of contributory negligence, and evidence is admissible to show a plaintiff's mental condition to aid the jury in determining whether he understood and appreciated the danger.").[4] Judge Kirsch reasons that these cases either rely on or adopt the authority which calls for special consideration in applying the reasonable person standard under extenuating circumstances where a person " 'unable to apprehend apparent danger

and to avoid exposure to it cannot be said to be guilty of negligence.' "*Creasy*, 696 N.E.2d at 445 (quoting *Riesbeck*, 111 Ind. App. at 475, 39 N.E.2d at 779 (citing in turn 38 Am.Jur., *Negligence* § 201, at 882)). Based on this authority, the Court of Appeals held that the rule in Indiana is "that a person's mental capacity, whether that person is a child or an adult, must be factored [into] the determination of whether a legal duty exists." *Creasy*, 696 N.E.2d at 446.

## C

As briefly noted in Part I–A, the generally accepted rule in jurisdictions other than Indiana is that mental disability does not excuse a person from liability for "conduct which does not conform to the standard of a reasonable man under like circumstances."[5] Restatement (Second) of Torts § 283B; *accord* Restatement (Third) of Torts § 9(c) (Discussion Draft Apr. 5, 1999) ("Unless the actor is a child, the actor's mental or emotional disability is not considered in determining whether conduct is negligent."). People with mental disabilities are commonly held liable for their intentional and negligent torts. No allowance is made for lack of intelligence, ignorance, excitability, or proneness to accident. *See* Restatement (Second) of Torts § 283B cmt. c.

Legal scholars and authorities recognize that it is "impossible to ascribe either the volition implicit in an intentional tort, the departure from the standard of a 'reasonable' person which defines an act of ordinary negligence, or indeed any concept of 'fault' at all to one who ... is by definition

---

4. In 1983, Indiana statutorily adopted a comparative fault scheme, subsuming the relevance of contributory negligence embodied in some of these cases. *See* Ind.Code § 34–51–2 (1998) (originally enacted as P.L. 317–1983, 1983 Ind. Acts 1930–33). However, courts have continued to apply principles of contributory negligence in the determination and balancing of comparative fault. *See, e.g., Walters v. Dean*, 497 N.E.2d 247, 254 (Ind.Ct.App. 1986); *Kroger*, 379 N.E.2d at 1010.

5. Scholars trace this rule to *Weaver v. Ward*, 80 Eng. Rep. 284 (K.B.1616), an English trespass case decided in an era when strict liability controlled trespass law. *See Gould*, 543 N.W.2d at 284 (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 135, at 1072 (1984)).

unable to control his [or her] own actions through any exercise of reason." *Anicet v. Gant,* 580 So.2d 273, 275 (Fla.Dist.Ct.App. 1991) (citations omitted). Rather, the Restatement rule holding people with mental disabilities liable for their torts was founded upon public policy considerations.

The public policy reasons most often cited for holding individuals with mental disabilities to a standard of reasonable care in negligence claims include the following.

(1) Allocates losses between two innocent parties to the one who caused or occasioned the loss. *See, e.g., Gould v. American Family Mut. Ins.,* 198 Wis.2d 450, 543 N.W.2d 282, 286 (1996). Under this rationale, the one who experienced the loss or injury as a result of the conduct of a person with a mental disability is presumed not to have assumed risks or to have been contributorily negligent with respect to the cause of the injury. This policy is also intended to protect even negligent third parties from bearing excessive liabilities. *See* Restatement (Third) of Torts § 9 cmt. e (Discussion Draft Apr. 5, 1999).

(2) Provides incentive to those responsible for people with disabilities and interested in their estates to prevent harm and "restrain" those who are potentially dangerous. *See, e.g., Gould,* 543 N.W.2d at 287.

(3) Removes inducements for alleged tortfeasors to fake a mental disability in order to escape liability. *See, e.g., id.* The Restatement mentions the ease with which mental disability can be feigned as one possible basis for this policy concern. *See* Restatement (Second) of Torts § 283B cmt. b(2).

(4) Avoids administrative problems involved in courts and juries attempting to identify and assess the significance of an actor's disability. *See id.* at cmts. b(1) &

b(2). As a practical matter, it is arguably too difficult to account for or draw any "satisfactory line between mental deficiency and those variations of temperament, intellect, and emotional balance." *Id.* at cmt. b(1).

(5) Forces persons with disabilities to pay for the damage they do if they "are to live in the world." *Id.* at cmt. b(3). The Restatement adds that it is better that the assets, if any, of the one with the mental deficiency be used "to compensate innocent victims than that [the assets] remain in their hands." *Id.* A discussion draft for the Restatement (Third) of Torts rephrases this policy rationale and concludes: "[I]f a person is suffering from a mental disorder so serious as to make it likely that the person will engage in substandard conduct that threatens the safety of others, there can be doubts as to whether this person should be allowed to engage in the normal range of society's activities; given these doubts, there is nothing especially harsh in at least holding the person responsible for the harms the person may cause by substandard conduct." Restatement (Third) of Torts § 9 cmt. e (Discussion Draft April 5, 1999).[6]

### D

To assist in deciding whether Indiana should adopt the generally accepted rule, we turn to an examination of contemporary public policy in Indiana as embodied in enactments of our state legislature. *See Schornick v. Butler,* 205 Ind. 304, 304, 185 N.E. 111, 112 (1933) (stating that the public policy of Indiana is derived from, *inter alia,* statutory enactments), *reh'g denied.*

Since the 1970s, Indiana law has strongly reflected policies to deinstitutionalize people with disabilities and integrate them

---

**6.** This final reason in particular suggests that a broader policy consideration supporting the generally accepted rule was an assumption that persons with mental disabilities should be institutionalized or confined, rather than "live in the world." This consideration will be discussed in the next section of this opinion.

into the least restrictive environment.[7] National policy changes have led the way for some of Indiana's enactments in that several federal acts either guarantee the civil rights of people with disabilities or condition state aid upon state compliance with desegregation and integrationist practices. *See, e.g., Individuals with Disabilities Education Act,* 20 U.S.C. § 1400 *et seq.* (1994) (requiring that children with disabilities receive a free appropriate public education in the least restrictive environment in states that accept allocated funds) (originally enacted in 1975 as the *Education for All Handicapped Children Act,* P.L. 94–142 (amending the state education grant program under the 1970 *Education for the Handicapped Act,* P.L. 91–230; requiring states to provide a free appropriate public education to all children with disabilities in order to receive state grant funds)); *Americans with Disabilities Act,* 42 U.S.C. § 12132 (1994), and implementing regulation 28 C.F.R. § 35.130(d) (1999) (providing that a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities); *Olmstead v.*

7. *See, e.g.,* Ind.Code § 22–9–1–2. (1998) (declaring that the public policy of Indiana is to provide equal opportunity in education, employment, and access to public conveniences and accommodations, and to eliminate segregation or separation based on, among other things, disability; defining "disability" as the physical or mental condition of a person which constitutes a substantial disability, *id.* § 22–9–1–3(r)) (originally prohibiting "handicap" as a ground for discrimination in P.L. 256–1975, 1975 Ind. Acts 1374); Ind.Code § 20–1–6–4 (accepting, as a state, all provisions and benefits of federal laws which provide for aid to children with disabilities; directing the State Board of Education to comply with all federal laws relating to special education activities) (originally enacted as P.L. 276–1947, 1947 Ind. Acts 1102, 1105–06, amended by P.L. 2–1988, 1988 Ind. Acts 7, 168–69); Ind.Code § 12–10–4–2 (directing the Division of Disability, Aging, and Rehabilitative Services to create respite care pilot programs with one purpose being to prevent or reduce the incidence of inappropriate institutional care of individuals with Alzheimer's disease and enable the individuals to remain in their own homes) (originally enacted as P.L. 2–1992, 1992 Ind. Acts 177, 244–45); Ind.Code § 12–11–1–1 (directing the Bureau of Developmental Disabilities Services to administer programs for community based residential alternatives to placement in institutions and health facilities; requiring that the programs simulate a homelike atmosphere with patterns and conditions of everyday life that are as close to normal as possible) (originally enacted as P.L. 2–1992, 1992 Ind. Acts at 279–80); Ind.Code § 12–11–1–3 (requiring, to the extent possible, that individuals with developmental disabilities be placed in the least restrictive programs) (originally enacted as P.L. 2–1992, 1992 Ind. Acts at 280–81); Ind.Code § 12–11–1–8 (prohibiting the Bureau from excluding individuals from placement in a residential facility because they have autism) (originally enacted as P.L. 2–1992, 1992 Ind. Acts at 281); Ind. Code § 12–11–2–5 (limiting the size of intermediate care facilities for people with mental retardation, such as group homes, to no more than eight individuals unless the placement is medically indicated and appropriate for the individual) (originally enacted as P.L. 2–1992, 1992 Ind. Acts at 282–84); Ind.Code § 12–11–10–1 (establishing a family support program to develop a family support policy state plan which assists families to care for persons with disabilities in their own homes and allows a person with a disability to live separately from his or her family if he or she so chooses) (originally enacted as P.L. 137–1993, 1993 Ind. Acts 3678, 3679); Ind.Code § 12–12–1–5 (directing the Rehabilitation Services Bureau to increase employment opportunities for people with disabilities, including supported employment in integrated settings for people with the most severe physical and/or mental disabilities) (originally enacted as P.L. 104–1996, 1996 Ind. Acts 1752, 1752–53); Ind.Code § 12–11–12 (authorizing a family subsidy account and directing the Bureau to use the money to support families to care for people with developmental disabilities in their own homes or to bring an individual home from an institution) (originally enacted as P.L. 112–1996, 1996 Ind. Acts 1792, 1792); Ind. Admin. Code tit. 511, r. 7–12–2 (1996) (requiring special education planning districts to ensure, to the maximum extent appropriate, that students with disabilities are educated with nondisabled students; also that students participate with students without disabilities to the maximum extent possible even where the primary placement is in a separate facility or institution).

*Zimring,* 527 U.S. 581, 119 S.Ct. 2176, 2185, 144 L.Ed.2d 540 (1999) (interpreting the Americans with Disabilities Act to find that "unjustified isolation ... is properly regarded as discrimination based on disability"); *Fair Housing Act,* 42 U.S.C. § 3604 (1994) (prohibiting discrimination based on "handicap" in the sale or rental of a dwelling) (originally enacted in 1968 as P.L. 90–284 to prohibit housing discrimination based on race, color, religion, or national origin; amended in 1988 by P.L. 100–430 to include protections for people with "handicaps").

These legislative developments reflect policies consistent with those supporting the Restatement rule generally accepted outside Indiana in that they reflect a determination that people with disabilities should be treated in the same way as nondisabled persons.

We pause for a moment to consider in greater detail the issue raised in footnote 6, that is, that the Restatement rule may very well have been grounded in a policy determination that persons with mental disabilities should be institutionalized or otherwise confined rather than "live in the world." It is clear from our recitation of state and federal legislative and regulatory developments that contemporary public policy has rejected institutionalization and confinement for a "strong professional consensus in favor of ... community treatment ... and integration into the least restrictive ... environment." [8] Indeed, scholarly commentary has noted that "new statutes and case law ... have transformed the areas of commitment, guardianship, confidentiality, consent to treatment, and institutional conditions." [9] We observe that it is a matter of some irony that public policies favoring the opposite ends—institutionalization and confinement on the one hand and community treatment and integration into the least restrictive environment on the other—should nevertheless yield the same common law rule: that the general duty of care imposed on adults with mental disabilities is the same as that for adults without mental disabilities.

■ In balancing the considerations presented in the foregoing analysis, we reject the Court of Appeals's approach and adopt the Restatement rule. We hold that a person with mental disabilities is generally held to the same standard of care as that of a reasonable person under the same circumstances without regard to the alleged tortfeasor's capacity to control or

8. Sarah Light, *Rejecting the Logic of Confinement: Care Relationships and the Mentally Disabled Under Tort Law,* 109 Yale L.J. 381, 390 & nn. 47–48 (1999) (citing M. Gregg Bloche & Francine Cournos, *Mental Health Policy for the 1990s: Tinkering in the Interstices,* 15 J. Health Pol. Pol'y & L. 387, 402 (1990); Brief Amici Curiae for the American Association on Mental Retardation, et al. Supporting Respondents at 9, *Olmstead v. L.C.,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (No. 98–536); Brief Amici Curiae for ADAPT, National Council on Independent Living, and TASH Supporting Respondents, *Olmstead* (No. 98–536); Brief Amici Curiae for the American Psychiatric Association and the National Alliance for the Mentally Ill Supporting Respondents at 21–22, *Olmstead* (No. 98–536)).

9. James W. Ellis, *Tort Responsibility of Mentally Disabled Persons,* 1981 Am. B. Found. Res. J. 1079, 1079–80 (1981). One legal scholar has noted: "The legislative goal of 'integrating' people with disabilities into society will never be fully accomplished unless tort law reflects a view that those people have a right to live in the world. Courts should require not only that people with disabilities take precautions for their own protection, but that society acknowledge their existence and make accommodations for them." Adam A. Milani, *Living in the World: A New Look at the Disabled in the Law of Torts,* 48 Cath. U.L.Rev. 323, 417 (1999). Other state courts have cited integration policies as the foundation for their tort law decisions. *See, e.g., Vaughn v. Northwest Airlines, Inc.,* 558 N.W.2d 736, 744 (Minn.1997) (finding that integration policy found in legislation making public accommodations accessible to people with disabilities could be incorporated in the common law as the result of "accumulated experience" and as common law rules are "carefully crafted both to reflect our traditions as a state and to address emerging societal needs").

understand the consequences of his or her actions.

## II

We turn now to the question of whether the circumstances of Rusk's case are such that the general duty of care imposed upon adults with mental disabilities should be found to run from him to Creasy.

## A

In asking this question, we recognize that exceptions to the general rule will arise where the factual circumstances negate the factors supporting imposition of a duty—particularly with respect to the nature of the parties' relationship and public policy considerations. For example, courts in jurisdictions that apply the reasonable person standard to individuals with mental disabilities have uniformly held that Alzheimer's patients who have no capacity to control their conduct do not owe a duty to their caregivers to refrain from violent conduct because the factual circumstances negate the policy rationales behind the presumption of liability. *See Colman v. Notre Dame Convalescent Home, Inc.*, 968 F.Supp. 809 (D.Conn.1997) (holding that while an adult with mental disabilities is ordinarily responsible for injuries resulting from negligence, no duty arises between an institutionalized patient and his or her caregiver); *Gould v. American Family Mut. Ins. Co.*, 198 Wis.2d 450, 543 N.W.2d 282 (1996) (carving out an exception to the presumption of liability for institutionalized people with mental disabilities who are unable to control or appreciate the consequences of their conduct when they injure paid caregivers and noting that these circumstances negate the rationale behind the presumption—application of the presumption would place an unreasonable burden on people with mental disabilities who are institutionalized); *Herrle v. Estate of Marshall*, 45 Cal.App.4th 1761, 53 Cal.Rptr.2d 713 (Ct.App.1996) (concluding that public policy precluded imposition of liability because the healthcare provider, not the patient, is in the best position to protect against risk of injury to the service provider where the risk is rooted in the reason for the treatment), *review denied* ; *Mujica v. Turner*, 582 So.2d 24 (Fla.Dist. Ct.App.1991) (holding nursing home patient with Alzheimer's was not liable for injury to a physical therapist), *review denied*; *Anicet v. Gant*, 580 So.2d 273 (Fla. Dist.Ct.App.1991) (concluding that a person who has no capacity to control his or her conduct does not owe a duty to refrain from violent conduct toward a person who is specifically employed to treat or control the patient), *review denied.*

## B

■ We find that the relationship between Rusk and Creasy and public policy concerns dictate that Rusk owed no duty of care to Creasy. *See Webb v. Jarvis*, 575 N.E.2d at 995 (balancing three factors to determine whether an individual owes a duty to another: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns).

### B–1

Unlike the typical victim supporting the Restatement rationale, Creasy was not a member of the public at large, unable to anticipate or safeguard against the harm she encountered. Creasy knew of Rusk's violent history. She could have changed her course of action or requested additional assistance when she recognized Rusk's state of mind on the evening when she received the alleged injury. Rusk's inability to comprehend the circumstances of his relationship with Creasy and others was the very reason Creasy was employed to support Rusk. The nursing home and Creasy, through the nursing home, were "employed to encounter, and knowingly did encounter, just the dangers which injured" Creasy. *Id.* at 276. In fact, caregivers and their employers under these circumstances are better positioned to prevent caregiver injury and to protect

against risks faced as a result of job responsibilities. In Indiana, the workers' compensation system, not the tort system, exists to cover such employment-related losses. To the extent that the workers' compensation system is inadequate as Creasy asserts, the inadequacy reflects defects in the workers' compensation system and is not a ground for alternative recovery under tort law.

■ An analogous situation arises in Indiana law under the fireman's rule. The "fireman's rule provides that firemen [or other public safety officials] responding in emergencies are owed only the duty of abstaining from positive wrongful acts." *Heck v. Robey,* 659 N.E.2d 498, 501 (Ind. 1995); *see also Sam v. Wesley,* 647 N.E.2d 382, 384 (Ind.Ct.App.1995). Public safety officials and caregivers such as Creasy are similarly situated in that they are "specifically hired to encounter and combat particular dangers," and by accepting such employment assume the risks associated with their respective occupations.[10] *Anicet,* 580 So.2d at 276.

### B–2

*Public Policy Concerns.* The first rationale behind the Restatement rule justifies imposing a duty on a defendant with a mental disability where it seems unfair to force a plaintiff who did not contribute to the cause of his or her injury to bear the cost of that injury. This policy concern overlaps with the relationship analysis set forth *supra.* The nature of Creasy and Rusk's relationship was such that Creasy cannot be "presumed not to have assumed risks . . . with respect to the cause of the injury." See Rationale (1), *supra,* Part I–C. Therefore, imposing a duty on Rusk in

this circumstance is not justified by the first Restatement policy rationale.

The second Restatement policy rationale creates an inducement for those responsible for a person with a mental disability to prevent harm to others. By placing Rusk in a nursing home, we presume Rusk's wife made a difficult decision based on her desire to prevent Rusk from being violent and harming himself, herself, or others. Without endorsing the incentives for confinement arguably fostered by the Restatement rationale, we agree with the conclusion set forth by the Wisconsin Supreme Court in *Gould* that a family member who places a relative in a long-term care facility, institution, nursing home, or similarly restrictive environment is unlikely to need further inducement to restrain the one for whom they are responsible. *See Gould,* 543 N.W.2d at 287. Mrs. Rusk entrusted her husband's care, including prevention of the harm he might bring to others, to the nursing home staff and the nursing home. And as a business enterprise, the nursing home received compensation for its services.

With respect to the third policy rationale, "it is virtually impossible to imagine circumstances under which a person would feign the symptoms of mental disability and subject themselves to commitment to an institution in order to avoid some future civil liability." *Id.; see also* Rationale (3), *supra,* Part I–C. To the extent that such circumstances exist, there is no evidence whatsoever that they are present under the facts in this case.

Finally, there are no administrative difficulties in this case with respect to determining the degree and existence of Rusk's mental disability.[11] Under the relationship

---

**10.** In *Heck v. Robey,* we concluded that the concept of incurred risk as embodied in the fireman's rule exception to the rescue doctrine was subsumed by Indiana's comparative fault scheme. *See* 659 N.E.2d at 505. However, we recognized that not every such case will go to trial: "A defendant will prevail at summary judgment if the plaintiff expressly assumed the risks of the activity and agreed to

hold the defendant harmless ... or *if the defendant otherwise had no duty to the plaintiff." Id.* (emphasis added).

**11.** Many legal scholars have questioned the significance of the "administrative difficulties and judicial efficiency" policy rationale behind the Restatement rule. They argue that our legal system regularly entrusts judges and

analysis set forth above and the present policy analysis, it is unnecessary to determine the degree of Rusk's mental disability. We need only conclude that Rusk had a mental disability which served as the reason for his presence in the nursing home and the foundation of his relationship with Creasy.

■ We agree with Judge Friedlander, *see Creasy*, 696 N.E.2d at 450–51 (dissenting), that there was no material question of fact as to the existence, let alone the advanced stage, of Rusk's Alzheimer's disease and his inability to appreciate or control his violent behavior. Rusk was admitted to the nursing home because he was confused and suffering from memory loss such that his wife could not care for him. By May 1995, when Creasy was injured by Rusk, Rusk had been a resident of the nursing home for three years and his condition had deteriorated. He regularly displayed behaviors characteristic of a person with advanced Alzheimer's disease such as aggression, belligerence, and violence. As evidence of Rusk's state of mind, Rusk presented an affidavit from Sharon Ayres stating that Rusk was in the advanced stage of Alzheimer's and was therefore unable to appreciate the consequences of his actions. The Court of Appeals rejected Ayres's statement on the ground that nothing in the affidavit qualified Ayres as an expert witness. We disagree.

■ Ayres was a licensed practical nurse employed by the nursing home at the time Creasy was injured. She had worked for the nursing home for approximately nine years. Indiana Evidence Rule 702 provides that a witness may be qualified as an expert by virtue of "knowledge, skill, experience, training, or education." Only one characteristic is necessary to qualify an individual as an expert. *See Fleener v. State*, 648 N.E.2d 652, 657 (Ind. Ct.App.1995), *vacated in part on other grounds, aff'd on all remaining grounds*, 656 N.E.2d 1140 (Ind.1995). Therefore, an affiant may qualify as an expert on the basis of practical experience alone. *See Fowler v. Napier*, 663 N.E.2d 1197, 1200 (Ind.Ct.App.1996). It is within the trial court's sound discretion to decide whether a person qualifies as an expert witness and we will reverse only upon a showing that the trial court abused its discretion. *Id.*

Ayres's affidavit states that she is a licensed practical nurse, which presumes that she received the medical training necessary to obtain that license. The affidavit also verifies that Ayres had worked for the nursing home for nine years at the time Creasy was injured—the entire time Rusk had lived there. Ayres's certification, associated training, practical experience gained through working for the nursing home for nine years, and three years of working with Rusk qualified her as an expert for purposes of assessing Rusk's mental state and rendering an opinion. We find that there is no genuine issue of material fact as to Rusk's mental capacity. Rusk was in the advanced stages of Alzheimer's and was unable to control or appreciate the consequences of his actions.

In addition to the public policy concerns behind the Restatement rule, we find that it would be contrary to public policy to hold Rusk to a duty to Creasy when it would place "too great a burden on him because his disorientation and potential for violence is the very reason he was institutionalized and needed the aid of employed caretakers." *Gould*, 543 N.W.2d at 286.

---

juries as fact-finders to make difficult determinations about mental competence for a range of legal issues (e.g., guardianship, contract and testamentary capacity, criminal proceedings, contributory negligence allocations in tort claims, and commitment hearings) because fact-finders are uniquely positioned to weigh evidence, judge credibility, assess witness testimony, and apply the law thereto. *See, e.g.*, Ellis, *supra*, note 9, at 1089; Wm. B. Hornblower, *Insanity and the Law of Negligence*, 5 Colum.L.Rev. 278, 283 (1905); Light, *supra* note 8, at 388 ("Such determinations [regarding mental competence] have proceeded without undue strain on the courts.").

## C

Rusk was entitled to summary judgment because public policy and the nature of the relationship between Rusk, Creasy, and the nursing home preclude holding that Rusk owed a duty of care to Creasy under these factual circumstances.

### Conclusion

Having previously granted transfer, thereby vacating the opinion of the Court of Appeals pursuant to Ind. Appellate Rule 11(B)(3), we now affirm the trial court, finding that Rusk did not owe a duty to Creasy, and grant Rusk's motion for summary judgment.

SHEPARD, C.J., and BOEHM and RUCKER, JJ., concur.

DICKSON, J., concurring and dissenting.

DICKSON, Justice, concurring and dissenting

I concur with Part I but dissent to Part II of the majority opinion. Citing sound legal and policy grounds, the majority holds in Part I that a person with a mental disability is generally held to an ordinary standard of legal responsibility without regard to the person's capacity to control or understand the consequences of his or her actions. But it concludes the opposite in Part II, finding as a matter of law that, because of this defendant's impaired mental condition, he had no general duty of reasonable care and is not responsible for the injuries he inflicted. Thus, notwithstanding its recognition that an impaired person remains legally accountable for injuries caused to innocent victims, the majority holds as a matter of law that the rule announced in Part I should not apply in this case primarily because of the relationship of the assailant to the victim, the extent to which the victim may have assumed the risk of injury, and the assailant's inability to control or appreciate the consequences of his actions. I disagree.

The majority supports its determination by analogy to the fireman's rule: " 'The rule basically provides that professionals, whose occupations by nature expose them to particular risks, may not hold another negligent for creating the situation to which they respond in their professional capacity.' " Heck v. Robey, 659 N.E.2d 498, 503 (Ind.1995) (quoting Koehn v. Devereaux, 495 N.E.2d 211, 215 (Ind.Ct.App. 1986)). Drawing upon this analogy, the majority states that caregivers such as the plaintiff are similarly situated to the public safety officials to whom the fireman's rule applies. 730 N.E.2d at 668. The majority suggests that the plaintiff assumed the risks created by caring for people with Alzheimer's disease when she chose to work in the nursing home.

We have, however, previously rejected such reasoning, refusing to use a person's occupation as a basis for finding a lack of duty. In Heck, this Court rejected a similar determination by the Court of Appeals that the plaintiff, a paramedic, had "impliedly assumed the risk of injury in the primary sense, based upon his choice of occupation." 659 N.E.2d at 505. We declined to extend the rationale of the fireman's rule to a paramedic—a paid public employee whose job was to rescue people. We said:

> We reject this primary assumption-of-risk terminology to the extent that it suggests that a lack of duty may stem from a plaintiff's incurred risk. Under the [Comparative Fault] Act, a plaintiff may relieve a defendant of what would otherwise be his or her duty to the plaintiff only by an express consent.

Id. at 505. See also id. at 502 n. 3 ("[T]he fireman's rule can no longer be based upon an assumption-of-risk rationale."). This Court ultimately refused to apply "[a]ny rule that purports to effect an absolute defense based upon incurred risk" because it is contrary to our comparative fault system. Id. at 505 (declining to address the continuing viability of the fireman's rule,

but refusing to extend it to bar an action by a paramedic).

In support of its determination, the majority cites other states that have refused to impose a duty based upon similar facts, but these states have adopted their rules based upon assumption of risk and analogies to the fireman's rule. *See . Gould v. American Family Mut. Ins. Co.*, 198 Wis.2d 450, 543 N.W.2d 282, 287 (1996) ("By analogy, this court ... relied on public policy considerations to exonerate negligent firestarters or homeowners from liability for injuries suffered by the firefighters...."); *Herrle v. Estate of Marshall*, 45 Cal.App.4th 1761, 53 Cal.Rptr.2d 713, 720 (Cal.Ct.App.1996) ("The very justifications for the application of primary assumption of risk in case of public firefighters ... compel its application herein."); *Anicet v. Gant*, 580 So.2d 273, 276 (Fla.Dist.Ct.App.1991) ("[T]he familiar 'fireman's rule' presents an apt analogy.... [I]ts very core is that a person specifically hired to encounter and combat particular dangers is owed no independent tort duty by those who have created those dangers...."). *See also Colman v. Notre Dame Convalescent Home, Inc.*, 968 F.Supp. 809, 813–14 (D.Conn.1997) (adopting the reasoning of *Gould* and *Herrle*.); *Mujica v. Turner*, 582 So.2d 24, 25 (Fla. Dist.Ct.App.1991) (rejecting the plaintiff's claim based upon *Anicet*).

Considering *Heck*, it is difficult to reconcile the majority opinion in this case with precedent—the majority, in essence, extends the fireman's rule by analogy to an employee of a private company whose job was not merely to rescue, but to provide daily care. *See Heck*, 659 N.E.2d at 505 (citing Comparative Fault Act and refusing to apply the fireman's rule). Although *Heck* acknowledged that a court may determine that no duty exists based upon the factors set forth in *Webb v. Jarvis*, 575 N.E.2d 992 (Ind.1991), *see Heck*, 659 N.E.2d at 505 n. 11, we did not intend that the analysis of incurred risk that we rejected in considering the fireman's rule would simply be re-incorporated into the *Webb* analysis.

Also in *Heck*, this Court expressed Indiana's public policy regarding the protection of plaintiffs who are injured in the course of their professional care for others when we held that a plaintiff's assumption of risk may not be inferred from his profession and may only serve as a bar to recovery when he has given express consent. 659 N.E.2d at 503–05. Accordingly, under Indiana's public policy, neither the plaintiff's choice of occupation nor the defendant's use of her services supports a finding that the defendant had no duty, as a matter of law.

I cannot agree with the majority's determination that the plaintiff's superior knowledge of the risks of her employment supports its finding that the defendant owed the plaintiff no duty of care. I disagree with the majority's reliance upon a plaintiff's superior knowledge of the risk as a basis for evaluating the question of duty. If extended to other cases, this rationale could subvert existing principles of responsibility fostered by tort law. Under such an approach, for example, high school teachers might be deprived of recourse for injuries inflicted by mentally or emotionally disabled high school students, or perhaps even students without such disabilities, because of the teachers' superior knowledge of the risks presented by such students. Similarly, health care personnel who care for patients—even those without mental disabilities—could be barred from remedy for injuries caused by such patients because the caregiver could be found to have superior knowledge of the risks of providing direct care in a hospital, and thus there could be no duty of care owed by the patient. It is not only unfair but also extremely unwise social policy to deprive, as a matter of law, such professionals of the tort remedy to which other victims of negligence are entitled.

In *Douglass v. Irvin*, 549 N.E.2d 368, 371 (Ind.1990), although a premises liability case, this Court expressly repudiated

the consideration of "equal or superior knowledge" in determining the issue of duty and limited its evaluation to the issue of breach of duty. As we noted in *Douglass* :

> If a duty of care exists, the determination of whether a breach of duty occurred is a factual question requiring an evaluation of the landowner's conduct with respect to the requisite standard of care. It is in this factual assessment that the issue of the landowner's and the invitee's comparative knowledge becomes relevant.

*Id.* at 370. This principle is equally applicable in the present case.

The majority correctly determined the issue of duty in Part I of its opinion, holding that a patient owes a duty of reasonable care under the circumstances and that a patient with a mental disease has the same duty of reasonable care. But in Part II it then reverses itself and fails to apply this rule to the defendant, exempting him from this principle of responsibility. Such individualized determinations of relative fault are not properly matters of law for determination by courts, but rather issues of fact for determination by juries. The plaintiff's incurred risk, if any, should be considered by a jury when it allocates fault under the Comparative Fault Act. IND.CODE §§ 34–51–2–7 & 34–51–2–8.

Accordingly, I concur in the majority's holding in Part I that a person with a mental disability owes a duty of reasonable care. But I dissent to the majority's conclusion in Part II that discriminates against caregivers and deprives them of fair recourse for injuries inflicted by a person with advanced Alzheimer's disease.